IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

UNITED STATES OF AMERICA

v.

OLAMIDE OLATAYO BELLO (1)

§
§
§
§
§
§

SEALED

Case No. 4:23CR 136
Judge Mazzant



## INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times material to the facts set forth in this Indictment:

#### *The Defendants and related entities*

1.     Defendant **Olamide Olatayo Bello ("Bello")** was an individual residing in

McKinney, Texas, in the Eastern District of Texas. **Bello** controlled and managed the

following business organizations, which were located and operated in McKinney, Texas,

in the Eastern District of Texas:

a.  Ajide Technology Corporation

b.  Smooth Multi-Services Platform

c.  Obello Solutions Corporation

d.  Obello, Inc.

e.  Yembell

f.  DOBIT

2.      Defendant ███████████████████ was an individual residing in Carlsbad, New Mexico.  Preferred Oil & Gas Services, LLC ("Preferred") was a business that was organized and operated in Midland, Texas.  ███████ was the managing member of Preferred.

3.      Defendant ███████████████████ was an individual residing in Midland, Texas.  Dfash Transportation, LLC ("Dfash") was a business that was organized and operated in Midland, Texas.  ████████ was the organizer and registered agent of Dfash.

4.      Defendant ██████████████████ was an individual residing in Midland, Texas.  Kenny Sunny ("Kenny") was a business organization located and operated in Midland, Texas.  █████ was the registered agent of Kenny.

5.      Defendant ████████████████████ was an individual residing in Spring, Texas. B-Light Services ("B-Light") was a business that was organized and operated in Frisco, Texas, in the Eastern District of Texas.  ████████ was a manager and the registered agent of B-Light.

Indictment
Page 2 of 22

6.     Defendant ████████████████████ was an individual residing in Odessa, Texas. Victor Motor's, LLC ("Victor") was a business that was organized and operated in Odessa, Texas. ██████ was the managing member and registered agent of Victor.

7.     Defendant ████████████████████ was an individual residing in Dallas, Texas. Zuby Automobile ("Zuby") was a business that was organized and operated in Dallas, Texas. ██████ was the owner of Zuby.

8.     Defendant ██████████████████████ was an individual residing in McKinney, Texas, in the Eastern District of Texas. Ejico Transportation, LLC ("Ejico"), also known as Ejico, LLC, was a business that was organized and operated in Garland, Texas. ██████ was the Chief Executive and registered agent of Ejico.

9.     Defendant ████████████████ was an individual residing in Princeton, Texas, in the Eastern District of Texas. S-O-Y was a business that was organized in Colorado. ██████ was affiliated with S-O-Y.

10.    Defendant ████████████████████████ was an individual residing in Katy, Texas. Yinxandpartners ("Yinx") was a business that was organized in Colorado and operated in Odessa, Texas. ██████ was the incorporator and registered agent of Yinx.

11.    Defendant ████████████████████ was an individual residing in Wylie, Texas, in the Eastern District of Texas. Josephine Catering Services

was a business that was organized and operated in Dallas, Texas.  ███████ was the sole proprietor of Josephine Catering Services.

### The Small Business Administration

12.     The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

13.     As part of this effort, the SBA enabled and provided for loans through banks, credit unions, and other lenders.  These loans have government-backed guarantees.

### The Paycheck Protection Program

14.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").

15.     To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business.  The PPP loan application required the business (through its authorized representative) to

acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application (SBA Form 2483), the small business (through its authorized representative) was required to state, among other things, its: (a) average monthly payroll expenses, and (b) number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, businesses applying for a PPP loan were required to provide documentation showing their payroll expenses.

16.     A PPP loan application was processed by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

17.     PPP loan proceeds were required to be used on certain permissible expenses, including payroll costs, mortgage interest, rent, and utilities. Under the applicable PPP rules and guidance, the interest and principal on the PPP loan is eligible for forgiveness if the business spent the loan proceeds on these expense items within a designated period of time and used a certain portion of the loan towards payroll expenses.

### *The Economic Injury Disaster Loan Program*

18.     The Economic Injury Disaster Loan ("EIDL") Program was an SBA program that provided low-interest financing to small businesses, renters, and

homeowners in regions affected by declared disasters. The CARES Act authorized the SBA to provide EIDLs up to $2,000,000 to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL. The amount of the advance was determined by the number of employees the applicant certified having. The advances did not have to be repaid.

19.    In order to obtain an EIDL and advance, a qualifying business was required to submit an application to the SBA and provide information about its operations, such as: (1) the number of employees, (2) gross revenues for the 12-month period preceding the disaster, and (3) cost of goods sold in the 12-month period preceding the disaster. The 12-month period for EIDLs for COVID-19 relief was from January 31, 2019, to January 31, 2020. The applicant was also required to certify that all the information in the application was true and correct to the best of the applicant's knowledge.

20.    EIDL applications were submitted directly to the SBA and processed by the agency with support from a government contractor, Rapid Finance. The amount of the loan, if the application were approved, was determined based on the information provided by the applicant about employment, revenue, and cost of goods, as described above. Any funds issued under an EIDL advance were issued directly by the SBA. EIDL funds could be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments. If the applicant also

obtained a loan under the PPP, the EIDL funds could not be used for the same purpose as the PPP funds.

## COUNT 1

Violation: 18 U.S.C. § 1349
(Conspiracy to Commit Wire Fraud)

21.    From approximately in or around April 2020, and continuing through the date of this Indictment, the exact dates being unknown to the Grand Jury, in the Eastern District of Texas, and elsewhere, the defendants,

OLAMIDE OLATAYO BELLO



along with others, both known and unknown to the grand jury, did knowingly and willfully conspire and agree to violate 18 U.S.C. § 1343, wire fraud, that is, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce any writings, signs, signals, pictures, and sounds for the purpose of executing a scheme and artifice to defraud and for obtaining  money and property by means of false and fraudulent pretenses, representations, and promises.

### Overview of the Conspiracy

22.     The defendants, led by **Olamide Olatayo Bello ("Bello")**, executed a scheme to defraud lenders and the SBA.  **Bello** recruited co-conspirators to use an existing business and to create a business to submit applications to obtain PPP funding. Once enlisted, **Bello** assisted his co-conspirators with the application paperwork, including fabricating supporting documentation and submitting the application through the online portals.  On the applications, the defendants misrepresented material information, such as the true nature of their business, the number of employees, and the amount of payroll.  Based on these material misrepresentations, the SBA, and other financial institutions on behalf of the SBA, approved and issued loans to the defendants. Once in receipt of the fraudulently obtained funds, the defendants did not use the money as intended, such as to pay employee salaries, cover fixed debt and utility payments, and continue health care benefits for employees.  Instead, the defendants typically paid **Bello**, transferred money to their personal accounts, and spent the funds on various personal purchases.

## Purpose of the Conspiracy

23.     It was the general purpose of the conspiracy for the defendants and their co-conspirators to unlawfully and unjustly enrich themselves by obtaining PPP and EIDL loan proceeds through materially false and fraudulent pretenses, representations, and promises.

## Manner and Means of the Conspiracy

24.    The manner and means by which the defendants and their co-conspirators sought to accomplish the purpose of the conspiracy included, among others, the following:

a.    The defendants registered and used sham, non-operational businesses, and in other instances existing businesses, under which they could submit PPP and EIDL loan applications.

b.    The defendants opened bank accounts under their names and their businesses to receive, deposit, and transfer PPP and EIDL funds.

c.    The defendants submitted materially false and fraudulent PPP and EIDL loan applications, misrepresenting, among other things, the number of employees and monthly payroll expenses.

d.    The defendants submitted falsified and fabricated supporting documentation in support of their loan applications.

e.    The defendants submitted the applications and accessed their PPP and EIDL loan accounts using the internet, frequently from an internet protocol ("IP") address that resolved back to **Bello's** residence in McKinney, Texas, in the Eastern District of Texas.

f.    The defendants used the PPP and EIDL funds for unauthorized personal purposes, including cash withdrawals, making luxury vehicle purchases, home improvements, and sending the money internationally via wire transfer.

g.    The defendants paid a portion of the PPP funds to co-conspirator **Bello**.

h.    The defendants caused transmissions that affected interstate commerce by sending wire transfers and by accessing and submitting the PPP and EIDL applications online.

## Acts in Furtherance of the Conspiracy

In furtherance of the conspiracy and to achieve its objects and purpose, the following acts, among others, were committed in the Eastern District of Texas and elsewhere.

### *Preferred Oil and Gas Services fraudulent PPP application*

25.    On or about March 16, 2021, Preferred Oil and Gas Services, LLC, ("Preferred") submitted a materially false PPP loan application to Amur Equipment Finance. ████████████████████ signed the PPP application as the primary contact and designated Wells Fargo Bank account number XXXXXX1473, in the name of Preferred ("Preferred Account 1473"), as the account to receive the loan funds.  On the application, ██████ certified that:

> *The funds will be used to retain workers and maintain payroll; or make payments for mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures as specified under the Paycheck Protection Program Rules; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.*

The Preferred PPP loan account was accessed electronically from IP address 12.11.136.106.

26.    On or about April 8, 2021, Preferred submitted a second materially false PPP loan application to Amur Equipment Finance to request a second draw on the original PPP loan.  Again, ██████ signed the second draw loan PPP application as the primary contact and designated the Preferred Account as the account to receive the loan

funds.  Once again, the Preferred PPP loan account was accessed electronically from IP address 12.11.136.106.

27.     The Preferred PPP application falsely stated that the business had 7 employees and had an average monthly payroll expense of approximately $44,533.  In support of the PPP application, ███████ submitted documentation, such as a copy of his driver's license, a voided check, an IRS 1120-S corporate tax return, an IRS 941 Quarterly federal tax document, financial statements, and an invoice.

28.     On or about March 18, 2021, Amur Equipment Finance funded the first draw PPP loan for Preferred and sent $111,332 to Preferred Account 1473.

29.     On or about June 14, 2021, Amur Equipment Finance funded the second draw PPP loan for Preferred and sent $111,332 to Preferred Account 1473.

### *Misuse of PPP funds*

30.     On January 11, 2020, **Bello** opened a business checking account at Wells Fargo Bank bearing account number XXXXXX0889, in the name of Ajide Technology Corporation ("Ajide Account 0889"). The mailing address for the Ajide Account 0889 was **Bello**'s residence in McKinney, Texas, in the Eastern District of Texas.  **Bello** was listed as the sole signer on Ajide Account 0889.

31.     On or about March 19, 2021, approximately one day after obtaining the first draw of the Preferred PPP loan, ███████ obtained a cashier's check drawn from Preferred Account 1473, made payable to **Bello's** company, Ajide Technology

Corporation ("Ajide"), in the amount of $33,399.60. This amount equaled exactly 30% of the PPP loan funds provided to Preferred. **Bello** was not an employee of Preferred.

32.    On March 19, 2021, the cashier's check payable to Ajide was deposited into Ajide Account 0889. The balance in Ajide Account 0889 prior to the deposit of $33,399.60 was approximately $6,000.

33.    On March 22, 2021, **Bello** made a $27,795.07 payment to Dovenmuehle Mortgage, Inc ("Dovenmuehle"). Dovenmuehle was the mortgage company that, at that time, held the loan for **Bello's** primary residence in McKinney, Texas, in the Eastern District of Texas. Without the $33,399.60 deposit from ███████, the payment by **Bello** to Dovenmeuhle would not have been possible.

34.    On April 19, 2021, **Bello** opened a business checking account at Navy Federal Credit Union, bearing account number XXXXXX1281, in the name of Ajide, ("Ajide Account 1281"). The mailing address for Ajide Account 1281 was in McKinney, Texas, in the Eastern District of Texas. **Bello** was listed as the sole signer on Ajide Account 1281.

35.    On or about June 18, 2021, approximately four days after obtaining the second draw of the Preferred PPP loan, ███████ obtained a cashier's check from the Preferred Account, made payable to Ajide, in the amount of $33,399.60. This again equaled exactly 30% of the PPP loan funds provided to Preferred. Again, **Bello** was not an employee of Preferred.

36.     On June 25, 2021, the cashier's check payable to Ajide was deposited into Ajide Account 1281. **Bello** was the sole signer on Ajide Account 1281. The balance in Ajide Account 1281 prior to the deposit of $33,399.60 was approximately $8,000.

37.     On June 28, 2021, **Bello** sent five intra-bank transfers totaling $25,000 to Navy Federal Credit Union account number XXXXXX1002 ("Bello Account 1002"), a personal checking account held in the name of **Bello**. The balance in Bello Account 1002 prior to the deposit of $25,000 was approximately $230. Immediately upon deposit into Bello Account 1002, **Bello** transferred $20,000 into Navy Federal Credit Union account number XXXXXX2297, held in the name of Smooth Multi-Services Platform ("Smooth Account 2297"). **Bello** is the sole signer on Smooth Account 2297.

38.     On June 30, 2021, $20,000 of the funds that originated from ███████, and transferred through Ajide Account 1281, were combined with other funds that were recently deposited into the Smooth Account 2297 by **Bello** into a $75,000 wire transfer, which was sent internationally to Nigeria.

### *Additional PPP loans that paid 22-32% to Bello*

39.     Further, in support of the scheme, much like the Preferred loan received by ███████, upon receipt of the PPP loans funds, many of the co-conspirators paid approximately 22-33% of PPP funds received to **Bello**. For instance:

    a.  On or about May 6, 2020, ████████████████████████ obtained a PPP loan for approximately $43,750 for his company, Yinxandpartners. Upon receipt of the PPP loan funds, ███████ wrote a

$14,145 check to Ajide, which equaled approximately 32% of the total PPP loan amount received. **Bello** was not an employee of Yinxandpartners.

b. On or about May 27, 2020, ████████████████████ obtained a PPP loan for approximately $30,767 for his company Dfash Transportation, LLC ("Dfash"). Upon receipt of the PPP loan funds, ████████ wrote a $6,000 check to **Bello's** wife, which equaled approximately 22% of the total PPP loan amount received. **Bello's** wife was not an employee of Dfash. Further, in support of the PPP loan, ████████ submitted a monthly bank statement that had been altered.

c. On or about May 30, 2020, ████████████████████ obtained a PPP loan for approximately $32,181 for his company Kenny Sunny. Upon receipt of the PPP loan funds, ████████ wrote a $9,600 check to Ajide, which equaled approximately 30% of the total PPP loan amount received. **Bello** was not an employee of Kenny Sunny.

d. On or about May 30, 2020, ████████████████████████ obtained a PPP loan for approximately $89,310 for his company, B-Light Services. Upon receipt of the PPP loan funds, ████████ wrote a $26,793.14 check to Ajide, which equaled 30% of the total PPP loan amount received. **Bello** was not an employee of B-Light Services.

e. On or about May 26, 2020, ████████████████████ obtained a PPP loan for approximately $53,500 for his company Victor Motor's, LLC. Upon receipt of the PPP loan funds, ████████ wrote a $16,050 check to Ajide, which equaled 30% of the total PPP loan amount received. **Bello** was not an employee of Victor Motor's, LLC.

f. On or about September 22, 2020, ████████████████████████ obtained a PPP loan for approximately $62,400 for his company Zuby Automobile. Upon receipt of the PPP loan funds, ████████ obtained a $18,720 cashier's check made payable to Smooth Multi-Platform, a company controlled by **Bello**, which equaled 30% of the total PPP loan amount received. **Bello** was not an employee of Zuby Automobile.

g. On or about February 18, 2021, ████████ obtained a second draw on the original PPP loan for approximately $62,400 for Zuby Automobile. Upon receipt of the PPP loan funds, ████████ obtained a $18,720 cashier's check made payable to Ajide, which equaled 30% of the total PPP loan amount received. Again, **Bello** was not an employee of Zuby Automobile.

h.  On or about March 5, 2021, ███████████████████████ obtained a PPP loan for approximately $116,332 for his company Ejico, LLC. Upon receipt of the PPP loan funds, ██████ wrote a $34,899 check to **Bello**, which equaled 30% of the total PPP loan amount received. **Bello** was not an employee of Ejico, LLC.

i.  On or about March 26, 2021, ████████████████████████ obtained a PPP loan for approximately $106,502 for his company S-O-Y. Upon receipt of the PPP loan funds, ██████ obtained a $31,950.06 cashier's check made payable to Ajide, which equaled 30% of the total PPP loan amount received. **Bello** was not an employee of S-O-Y.

j.  On or about May 14, 2021, ██████ obtained a second PPP loan for approximately $120,257 for B-Light Services. Upon receipt of the PPP loan funds, ████████ wrote a $37,650 check to Ajide, which equaled 31% of the total PPP loan amount received. Again, **Bello** was not an employee of B-Light Services.

k.  On or about May 23, 2021, ████████████████████████████ obtained a PPP loan for approximately $141,373 for her company Josephine Catering Service. Upon receipt of the PPP loan funds, ██████ obtained a $42,411.90 cashier's check made payable to Smooth Multi-Services Platform, which equaled 30% of the total PPP loan amount received. **Bello** was not an employee of Josephine Catering Service.

### *PPP loans obtained by Bello*

40.    On August 21, 2015, **Bello** opened a personal checking account at Community America Credit Union bearing account number XXXXXX1701 ("Bello Account 1701"). The mailing address for Bello Account 1701 was **Bello**'s residence in McKinney, Texas, in the Eastern District of Texas. **Bello** was listed as the sole signer on Bello Account 1701.

41.     On May 18, 2017, **Bello** opened a personal checking account at Citibank, N.A., bearing account number XXXXXX3173 ("Bello Account 3173"). The mailing address for Bello Account 3173 was **Bello's** residence in McKinney, Texas, in the Eastern District of Texas. **Bello** was listed as the sole signer on Bello Account 3173.

42.     On January 13, 2020, **Bello** opened a personal checking account at Wells Fargo Bank bearing account number XXXXXX0897 ("Bello Account 0897"). The mailing address for Bello Account 0897 was **Bello's** residence in McKinney, Texas, in the Eastern District of Texas. **Bello** was listed as the sole signer on Bello Account 0897.

43.     On October 2, 2020, **Bello** opened a business checking account at BB&T bearing account number XXXXXX5834, in the name of Obello, Inc. ("Obello Account 5834"). The mailing address for Obello Account 5834 was **Bello's** residence in McKinney, Texas, in the Eastern District of Texas. **Bello** was listed as the sole signer on Obello Account 5834.

44.     Further, in support of the scheme, **Bello** also obtained multiple PPP loans for businesses that he owned and controlled. For instance:

a. On or about July 31, 2020, **Bello** obtained a first draw PPP loan for approximately $40,100 for his company Yembell, which was deposited into **Bello** Account 1701, which was a personal checking account held by **Bello**, not a company checking account in the name of Yembell.

b. On or about January 29, 2021, **Bello** obtained a second draw PPP loan for approximately $43,800 for his company Yembell, which was deposited into Bello Account 5834. In support of the PPP loan draw, **Bello** submitted a monthly bank statement that had been altered.

c. On or about May 29, 2020, **Bello** obtained a first draw PPP loan for

approximately $52,000 for his company Obello Solutions Corporation, which was deposited into Bello Account 3173.  In support of the second PPP loan draw, **Bello** submitted a monthly bank statement that had been altered.

d. On or about February 25, 2021, **Bello** obtained a second draw PPP loan for approximately $115,500 for his company Obello Solutions Corporation, which was deposited into Bello Account 0897.  In support of the second PPP loan draw, **Bello** submitted a monthly bank statement that had been altered.

### *EIDL loans obtained by Bello*

45.    On June 18, 2021, **Bello** opened a business checking account at Navy Federal Credit Union bearing account number XXXXXX8123, in the name of DOBIT ("DOBIT Account 8123").  The mailing address for DOBIT Account 8123 was **Bello's** residence in McKinney, Texas, in the Eastern District of Texas.  **Bello** was listed as the sole signer on DOBIT Account 8123.

46.    Further, in support of the scheme, **Bello** also obtained multiple EIDL loans for businesses that he owned and controlled.  For instance:

a. On or about June 2, 2020, **Bello** obtained an EIDL loan for approximately $90,000 for his company Ajide Technology Corporation, which was deposited into Ajide Account 0889.

b. On or about June 22, 2021, **Bello** obtained an EIDL loan for approximately $499,900 for his company DOBIT, which was deposited into DOBIT Account 8123.

c. On or about November 30, 2021, **Bello** obtained additional EIDL loan funds in the amount of $779,500 for his company DOBIT, which were also deposited into DOBIT Account 8123.

### *Misuse of $89,900 in EIDL funds received by Bello*

47.    On June 2, 2020, the EIDL funds totaling $89,900 were deposited by the SBA into Ajide Account 0889.

48.    In addition, on June 2, 2020, the $26,793.74 check from ▮▮▮▮▮▮ (which represented 30% of the PPP loan funds paid to B-Light) was also deposited into Ajide Account 0889.   The balance in Ajide Account 0889 prior to these two deposits was approximately $20,562.47.

49.    On June 5, 2020, **Bello** wrote a $60,800 check made payable to Dodge City of McKinney for the purchase of a 2020 Dodge Ram 1500 truck, which is registered to Ajide Technology Corporation and **Bello** at **Bello's** residence, in McKinney, Texas, in the Eastern District of Texas.

### *Misuse of $499,900 in EIDL funds received by Bello*

50.    From June 23, 2021, through June 30, 2021, **Bello** transferred approximately $261,000 from DOBIT Account 8123 to other personal and business bank accounts he controlled.   During this time frame, there were no other funds deposited into DOBIT Account 8123.

51.    In addition to the outgoing transfers, **Bello** also made the following purchases utilizing the EIDL funds that were deposited into DOBIT Account 8123:

    a.  $72,064.10 payment to Goodleap, LLC, for the purchase of solar panels, which were installed on **Bello's** residence.

    b.  $50,000 check made payable to Mercedes-Benz of McKinney for the purchase of a 2020 Mercedes-Benz G550 luxury automobile, which is registered to **Bello** at **Bello's** residence, in McKinney, Texas, in the Eastern District of Texas.

      c.   Two payments totaling $119,891.32 to Ally Bank to pay off two Dodge Ram trucks that were personally owned by **Bello**.

52.    The $261,000 of transfers to personal and non-affiliated companies owned and operated by **Bello**, combined with the $243,891.32 in purchases made by **Bello**, completed depleted the $499,900 EIDL funds deposited into DOBIT Account 8123

    All in violation of 18 U.S.C. § 1349.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

1.    The allegations contained in Count One are hereby realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2.    Upon conviction of any violation of 18 U.S.C. § 1349, the defendants shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful

activity," or a conspiracy to commit such offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

3.    The property that is subject to forfeiture includes, but is not limited to, a money judgment, and all interest and proceeds traceable thereto, representing the proceeds of the offenses, for which the defendants are jointly and severally personally liable.

4.    Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendants up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the name of the defendants.

5.    By virtue of the commission of the offense alleged in this indictment, any and all interest the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C.

§§ 981(a)(1)(C) and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

_____
GRAND JURY FOREPERSON

DAMIEN M. DIGGS
UNITED STATES ATTORNEY

_____
SEAN J. TAYLOR
Assistant United States Attorney

_____
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **SEALED** |
| | § | |
| v. | § | Case No. 4:23CR |
| | § | Judge |
| OLAMIDE OLATAYO BELLO (1) | § | |



### NOTICE OF PENALTY

### Count One

**Violation:**    18 U.S.C. § 1349
(Conspiracy to Commit Wire Fraud)

**Penalty:**    A fine of $250,000, or twice the pecuniary gain to the defendant or loss of the victim(s), whichever is greater; imprisonment for not more than 20 years; and a term of supervised release of not more than 3 years.

**Special
Assessment:**    $100