1                    UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF TEXAS (SHERMAN DIVISION)

3    UNITED STATES OF AMERICA,
                                        Case No. 4:23-cr-00136-ALM-
4                   Plaintiff,          BD-1

5    v.                                 Sherman, Texas
                                        December 13, 2024
6    OLAMIDE OLATAYO BELLO,             2:22 p.m.

7                   Defendant.

8
                     TRANSCRIPT OF EVIDENTIARY HEARING
9                    BEFORE THE HONORABLE BILL DAVIS
                     UNITED STATES MAGISTRATE JUDGE
10
     APPEARANCES:
11   For the Plaintiff:              Sean J. Taylor, Esq.
                                     U.S. Attorney's Office
12                                   600 East Taylor, Suite 2000
                                     Sherman, TX 75090
13
     For the Defendant:              Olamide Olatayo Bello, Pro Se
14                                   65100-510
                                     Fannin County Jail
15                                   2389 Silo Road
                                     Bonham, TX 75418
16
                                     Phillip A Linder, Esq.
17                                   (standby counsel)
                                     Barrett Bright Lassiter Linder
18                                   Perez - Dallas
                                     3300 Oak Lawn Ave
19                                   Suite 700
                                     Dallas, TX 75219
20
     Court Recorder:                 MMC
21
     Transcription Service:          Chris Hwang
22                                   Abba Reporting
                                     PO Box 223282
23                                   Chantilly, Virginia  20153
                                     (518) 302-6772
24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

1

**<u>INDEX</u>**

2

3

| <u>WITNESSES FOR PLAINTIFF</u> | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| Olamide Bello | | 34 | | |
| Jason Redding | 56 | 70 | 86 | |

4

5

6

<u>WITNESSES FOR DEFENDANT</u>

7

n/a

8

9

| <u>EXHIBITS</u> | | | <u>OFFERED</u> | <u>RECD</u> |
|---|---|---|---|---|
| Plaintiff's 3 | | | 42 | 42 |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to order at 2:22 p.m.)

2          THE COURT:  Please be seated.  We're here on number

3     423-CR-136, United States v. Bello.  If I can have

4     announcements, please?

5          MR. TAYLOR:  Good morning, Your Honor, Sean Taylor

6     for the United States, ready to proceed.

7          THE COURT:  Thank you.

8          And if I could make sure we have the microphone

9     turned on and if you could speak into it, so we can get a good

10    recording.

11         THE DEFENDANT:  Olamide Olatayo Bello ready to

12    proceed, Your Honor.

13         THE COURT:  Okay.  And Mr. Linder, you're here

14    standing by, is that right?

15         MR. LINDER:  Yes.

16         THE COURT:  Okay, thank you.

17         So we're here on the Defendant's motions to suppress,

18    which are dockets number 353, 354, and 357.  This is Mr.

19    Bello's motion, so my thought is that he can start and then the

20    Government can respond.  Is that the appropriate course in the

21    parties' views?

22         MR. TAYLOR:  Yes, Your Honor.

23         MR. LINDER:  I believe so, Your Honor, but I would

24    like to put a few things on the record that pertain to other

25    discovery matters just so we're covered.

1          THE COURT:  Okay.

2          MR. LINDER:  The Government has provided with me

3     today and I've discussed it with Mr. Bello a box of his

4     electronics that were seized, cell phones, computers, and

5     things like that.  I am going to make arrangements to have that

6     delivered to the jail where Mr. Bello Is.  I believe he's still

7     in Fannin --

8          You still in Fannin County?

9          THE DEFENDANT:  Yes.

10          MR. LINDER:  Okay.  To where an investigator or

11     myself or a paralegal can sit with him and let him have access

12     to the devices between now and the trial.

13          And it's also my understanding that Mr. Smith is

14     going to provide Mr. Bello at some point in the next week or

15     two a list of the exhibits he intends to use at trial and I

16     guess potentially copies or prints of those exhibits, so that

17     he will be more prepared before trial to know kind of what the

18     Government's going to offer.

19          THE COURT:  Okay, so everything you just said goes to

20     discovery issues that are unrelated to the motion to suppress.

21          MR. LINDER:  Correct.  I just kind of wanted as we go

22     through this, I just want to make sure it was covered.

23          THE COURT:  Thank you, I appreciate that.

24          Mr. Bello, will you be calling any witnesses today?

25          THE DEFENDANT:  No, Your Honor.

1           THE COURT:  Okay.  You're welcome to sit there if you

2   want or you can stand at the lectern, whatever your preference

3   is, it's okay with me, but you can proceed on your motions.

4           THE DEFENDANT:  Your Honor, today before I proceed,

5   there's a pending jurisdictional issue on jurisdictional

6   (indiscernible) that we need to clear for us to proceed to make

7   sure this (indiscernible) jurisdiction issue.

8           Because without that being clear, we (indiscernible)

9   because you have to (indiscernible) issue for us.

10          THE COURT:  Okay, I'll take your argument on the

11  Article 3 question.

12          THE DEFENDANT:  Your Honor, in the indictment, I was

13  indicted because I control and managed a corporation.  It's

14  part one of the indictment.

15          Now as a control person, the primary violation was

16  not addressed.  The control, a manage person where the control

17  person and managed person doesn't have any allegation, the

18  Government have to go to the service of process to get to the

19  control and manage person.

20          Now the role in that may involve around payroll

21  manage and control, which is (Indiscernible) without a

22  (indiscernible) evaluation.

23          THE COURT:  How does this go to Article 3

24  jurisdiction?

25          THE DEFENDANT:  Article 3 jurisdiction say, they put

1    number one, subject matter jurisdiction and fiduciary share and

2    (indiscernible) and Section 230 because the controlled and

3    managed person, they're Section 230 corporations.  They're

4    Internet compliant.  They provide software.  And they even the

5    control and manage person is also is Section 230

6    (indiscernible).

7              THE COURT:  Give me your best case for why that means

8    the Court does not have jurisdiction?

9              THE DEFENDANT:  Hold on, Your Honor.  If we go to the

10   (indiscernible) statement 772(f)(2)(D), the provision shall

11   prohibit the court from exercising personal jurisdiction over

12   an individual who's only action in forum state we're taking in

13   the individual capacity as a corporate representative if the

14   Court has personal jurisdiction over the corporation itself.

15             Now, at the same time, it does so.  Business code

16   21.223(a)(2) also (indiscernible) share for the control and

17   managed person.

18             Now before the Government can actually get to the

19   control and manage person, they have a official process which

20   is the civil case, not a criminal case.

21             I have also in Harris v. Tremos, case number 19:1132-

22   MMJ, I know (indiscernible) as a corporate officer in a

23   diversity jurisdiction controversy such as this is insufficient

24   enough to -- it's insufficient enough to establish the minimum

25   (indiscernible) to subject the individual to personal

1   jurisdiction.

2            THE COURT:  Mr. Bello, so I'm having a bit of trouble

3   understanding you.  Let me just ask, are those criminal cases

4   that you're citing?  Are they civil cases or criminal cases or

5   do you know?

6            THE DEFENDANT:  The short case, because my number

7   one, I'm -- I have the case number.  It's a few second and can

8   define what I -- I couldn't tell it's a criminal or civil case

9   for now, but I can do the research and find out.

10           THE COURT:  Okay.  Why don't you wrap up your

11  argument on jurisdiction and then move to your argument on the

12  motions to suppress?

13           THE DEFENDANT:  Okay.  Now on the jurisdictional

14  issue, I believe fiduciary shield, liability shield, and also

15  Section 230 (indiscernible) covered the control and managed

16  person.

17           And before the Government get to the control and

18  managed person, they have to have a primary evaluation of the

19  controlled and managed person.

20           Without the primary evaluation, they become

21  indispensable party, which there's no -- nothing can be

22  replaced without indispensable party.

23           THE COURT:  Uh-huh.

24           THE DEFENDANT:  That a court can really address.

25           THE COURT:  It sounds to me like you're talking about

1    a civil case.  And I'm -- we're here in a criminal case.  You

2    understand that, right?

3            THE DEFENDANT:  Your Honor, this case because it

4    being established as a criminal case, it's supposed to be a

5    civil case.

6            THE COURT:  Uh-huh.

7            THE DEFENDANT:  Because if emphasize on the control

8    and manage person.  And everything I link in the discovery is

9    all like a Billy Troping (phonetic) United States an, SBA case,

10   Billy Troping was taking not the owner of the.  So this case

11   supposed to be a civil case.

12           THE COURT:  Okay.  And that's the basis for your

13   jurisdictional challenge?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Okay, I understand your argument, I

16   think, on that point.  Unless you have further argument on

17   jurisdiction, you should move to your motion to suppress.

18           THE DEFENDANT:  On the motion to suppress, then 353,

19   when the Government came to my house and the -- they did knock

20   (indiscernible) by the time they got to the door, I was at the

21   door on timely.

22           THE COURT:  Sorry, I'm sorry can you say that again?

23           THE DEFENDANT:  When they came to my house --

24           THE COURT:  Yeah.

25           THE DEFENDANT:  -- to research the warrant, I was at

1    the door.  Within a reasonable time, I unlocked the door.  So

2    instead of (indiscernible) to open the door, they entered the

3    door with forced entry.  They (indiscernible) by the door in my

4    house up to now.  We have a bit of money to fix it.  That's the

5    first entry.

6           Now when they told me what was going on, I invoked my

7    right to the attorney.  After that, the (indiscernible) compel

8    me to produce my password to my phone with the (indiscernible).

9           So they (indiscernible), now they took my phone away.

10   Now on this argument here, on the 353, they presented evidence

11   against me through the pre-trial release revocation.

12          And when I got the discovery, I realize those

13   everything were altered.  They changed things and everything.

14   So I have the proof right here with me, Your Honor.

15          THE COURT:  And that leads to one of my questions.

16   Are you -- so you're not putting on a witness.  Are you

17   presenting any evidence?

18          THE DEFENDANT:  Yes, for everything, Your Honor.

19          THE COURT:  Your motion and --

20          THE DEFENDANT:  Yes.

21          THE COURT:  How will that be presented?

22          THE DEFENDANT:  It's right here with me, Your Honor.

23          THE COURT:  And I guess I -- I don't know if you're

24   wanting to be placed under oath and testify.  I think if you

25   wanted to consider that, you'd have to consider it carefully --

 1          THE DEFENDANT:  Sure.

 2          THE COURT:  -- because if you do that, then you'd be

 3   subject to cross-examination or getting into the merits of your

 4   case.  The Government could ask you what it wanted to ask you.

 5   I would want to make sure that you're okay with that approach.

 6   I guess maybe if Mr. Linder has thoughts on that, it would be

 7   appropriate to share those.

 8          THE DEFENDANT:  I'm okay with the approach, Your

 9   Honor.

10          THE COURT:  I'm sorry?

11          THE DEFENDANT:  I'm okay with the approach, Your

12   Honor.

13          THE COURT:  With the what?

14          THE DEFENDANT:  With the putting under oath.

15          THE COURT:  To be placed under oath?

16          THE DEFENDANT:  Yes.

17          THE COURT:  And to testify today --

18          THE DEFENDANT:  Yes.

19          THE COURT:  -- as part of your motions --

20          THE DEFENDANT:  Yes.

21          THE COURT:  -- even though you realize that anything

22   you say can be used against you in your criminal case?

23          THE DEFENDANT:  Your Honor, yes.

24          THE COURT:  Okay, unless there's an objection from

25   the Government, I will -- or from Mr. Linder as standby

1    counsel, I'll place Mr. Bello under oath.

2              MR. TAYLOR:  The Government has no objection.  I

3    don't know if Mr. Linder, if you want to take a moment just to

4    confer.  That's a pretty important decision, I think.

5              MR. LINDER:  Three minutes, Your Honor.

6              THE COURT:  I'd be happy to give you that chance,

7    yes.

8         (Counsel confers with the Defendant)

9              MR. LINDER:  Your Honor, I conferred with Mr. Bello.

10   He would like to proceed by being placed under oath at this

11   point.

12             THE COURT:  Okay, Ms. Jackson will place Mr. Bello

13   under oath.  If you'd please raise your right hand?

14        (The Defendant is sworn)

15             THE COURT:  Okay, and you understand that you're

16   under oath now.  Anything that you can say can be use against

17   you.  The Government will have an opportunity to cross-examine

18   you to the extent you're here testifying as a witness.  Do you

19   understand that?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Okay, so I think it's fine for you to

22   proceed in a narrative form rather than a question and answer

23   form.  And if you want to testify to the facts that you're

24   about to get into, you can proceed.

25             THE DEFENDANT:  Your Honor, in the WhatsApp messages

1    they used (indiscernible) based on the document in the evidence

2    produced, provided to me, Sabur share with them that he

3    took -- Sabur give them the information and give them

4    information on the WhatsApp messages that was used for the

5    pre-trial revocation.

6         Now and there was no message.  Looking at the screen,

7    because I look at the discovery they brought to me at the

8    present to my time to go over the whole thing.

9         Now this (indiscernible), this one right here, is the

10   last message which Sabur say it did not know the people from

11   Nigeria that contacted him.

12        But in the pre-trial revocation, they said

13   (indiscernible), said that Sabur was also in a -- the same or

14   subgroup with the people in Nigeria.

15        Now why you are in the same or subgroup?  There's no

16   way you can say you don't know the people on the same group

17   with which is a lie.

18        Sabur had a clear knowledge of number because this

19   one pre-trial revocation for (indiscernible) review stated

20   on -- I'm not too sure about the (indiscernible), said Sabur

21   was also in the same or subgroup with the people that contacted

22   in from Nigeria.

23             THE COURT:  Okay.  And --

24             THE DEFENDANT:  Now --

25             THE COURT:  -- let me, if I could just --

1           THE DEFENDANT:  Sure.

2           THE COURT:  -- pause for a minute and ask.  I just

3    want to make sure I understand how this goes to your motions to

4    suppress.  Could you explain that to me?

5           THE DEFENDANT:  Yeah, because I'm about to bring up

6    the altered evidence the Government used.  They used for my

7    pre-trial revocation.  There were some messages that was given

8    to me.  The discovery was printed out and I have all the copies

9    here.

10          So I took my time to run through all the messages,

11   (indiscernible) together and I find out where it was alter.  It

12   was used against me for my pre-trial revocation.

13          THE COURT:  Okay.

14          THE DEFENDANT:  So now -- and I'm trying to analyze

15   it from the (indiscernible) you follow me through.  This is the

16   first page.  It show that the people that contacted Sabur

17   Yusuff from Nigeria.

18          Precisely, Sabur Yusuff was not there in the

19   pre-trial revocation, which violated my right to a

20   confrontational clause.  It wasn't there.

21          But the Agent Delaney (phonetic) testified on behalf

22   of Sabur.  Now in the preceding message, that day, he only

23   presented few of the app messages, not everything, which is

24   completed information also as well.

25          Now in my discovery, we have all this information in

1    my discovery.  On the first page of the screenshot of the

2    WhatsApp, it shows only Sabur, these two numbers that contacted

3    Sabur, the date that Sabur claimed he was contacted.  Everybody

4    else doesn't show that day.  That tells me only those two

5    people contacted Sabur within that time frame.

6          Now Sabur claimed he forwarded a message to his wife.

7    It doesn't show his wife on the list.  So, presumably, he lied

8    about that.

9          Number two, I have these messages right here to

10   confirm the first page I'm showing you because it show deleted.

11   It shows right here deleted.  So it tells me the last activity

12   on the last contact person by Sabur.  So this confirm -- this

13   page here confirm this was the last activity by the two last

14   people by Sabur Yusuff.  That's one.

15         Now moving forward to confront with two people that

16   was less activity.  This also confirm the other fellow, the

17   1185 as well.  Now looking at it now, they gave me

18   (indiscernible).  This two that we see messages, Your Honor.

19         Now (indiscernible) coming out to you, one says the

20   message was (indiscernible).  Government did not provide that

21   information during the pre-trial revocation.

22         Now another thing, one says I show you I am not

23   trying to sell you, sir.  They say, A, they assure, spelling is

24   A-S-U-U-R-E.  Another one here, the assure spelling is A-S-U-R-

25   E.  It was altered, Your Honor.  The Government used altered

1    messages to find me guilty, Your Honor.  That's one.

2             Number two, to confirm when we (indiscernible)

3    confirm, the federal emphasize I'm from the Nigeria, I was

4    (indiscernible).  I'm not in Nigeria, Your Honor.

5             This (indiscernible), too, if you look at the

6    screenshot of these messages, compare it to the same number,

7    2270, they're different background, different layout.  I marked

8    everything, but you see messages.

9             If someone is talking to you -- even they seem == if

10    you look at the picture, the logo, you had messages with a

11    different logo.  That means someone alter this in some way.

12    It's not the original -- in its originality, Your Honor.

13             There's few errors as well that I have, that I can

14    compare on the two logos.  Okay, this is a special that was

15    (indiscernible) and given to me.  And this is another special

16    that was painted and given to me.  They were inconsistent, Your

17    Honor.

18             (Indiscernible), Your Honor.  The Microsoft Word

19    document they share shows a metadata that is there.  Your

20    Honor, in my life, I can store over -- on over 1,000 computers,

21    well, that's what I do.

22             Now in Microsoft Office, if anybody familiar with the

23    metadata on the Microsoft Office does not determine the actual

24    user of the computer that time.

25             Because when you buy a Microsoft Office and you say

1    to license people, like I said, I'm (indiscernible), that's

2    what I do for a living.  I develop software.  I'm a Microsoft

3    certified professional.

4           So I have -- I (indiscernible) licensing.  I spoke

5    over here for (indiscernible) in India, in Nigeria, in U.S.  So

6    give me Nigeria.  I go to Microsoft.  I buy the computer from

7    them.  I ship to workers in Nigeria.

8           Because I'm (indiscernible) the -- my computer,

9    anybody can buy Microsoft Office, register Microsoft Office.

10   If I have a computer, I can demonstrate it right now.  If all

11   this evidence I have, I can demonstrate their technical.

12          Anybody can register Microsoft Office and put the

13   (indiscernible).  That wasn't mean the person using that

14   computer at that particular time is (indiscernible).

15          THE COURT:  Okay, so I'm trying to match up with what

16   you're saying with what you filed.  Does this go to your claim

17   about the data center?  '

18          THE DEFENDANT:  No, it goes to the claim about

19   altered messages and what they use to -- what they used against

20   me for the pre-trial.  So I put all the evidence together.  And

21   it goes back to Microsoft, the metadata, the WhatsApp messages

22   and all the submitted that were altered and not in the

23   originality.

24          THE COURT:  Okay, as I understand -- give me one

25   minute here.  Okay, so what you're talking about is evidence

1    that was used at your detention hearing; is that right?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  Okay.  And are you contending that any of

4    that evidence or any other evidence that was mentioned in your

5    filings was obtained without a warrant or is -- are you

6    agreeing that there was a warrant for this evidence?

7            THE DEFENDANT:  No, there was another motion for them

8    because they pick up my phone.  And they went to my phone.  And

9    that was (indiscernible).  This one is (indiscernible)

10   evidence.  This 354.  This one we're talking now is 353.

11           THE COURT:  Right.  So, today, we have three motions

12   that we're hearing argument on or having a hearing on.  It's

13   353, 354 --

14           THE DEFENDANT:  Yes.

15           THE COURT:  -- and 357.

16           THE DEFENDANT:  I'm at 353 now, Your Honor.

17           THE COURT:  Okay, but I guess what I'm wondering

18   about is in connection with any of those motions, are you

19   saying that some of the evidence was acquired without a search

20   warrant?

21           THE DEFENDANT:  Yes, Your Honor.  On the phone, my

22   phone, they took my phone.  That's another motion.  And they

23   took my phone away.

24           THE COURT:  You said that's another motion.

25           THE DEFENDANT:  Yes.

1        THE COURT:  But again, I want to focus on the motions

2   that are set for today.

3        THE DEFENDANT:  Yes, now we're focusing on 353 now,

4   which is focused on alter evidence, which is -- sorry, Your

5   Honor.

6        Yeah, on the 353 motion is a motion to -- for the

7   alter evidence to suppress everything because they were alter

8   on the 353.

9        THE COURT:  Altered evidence is what you're saying?

10       THE DEFENDANT:  Yes, yes.  They were altered.  They

11  were altered.  And also on the altered evidence, what I did was

12  all the discovery I have, I went through all the screenshot and

13  (indiscernible) only one.  There were the zip contents, but

14  different screenshot.

15       And also, there little changes in the word because if

16  someone force some (indiscernible) and you take a screenshot,

17  there would be no change in the word like --

18       THE COURT:  Okay, so you're talking about documents.

19  Are you admitting any -- seeking to admit any exhibits today?

20       THE DEFENDANT:  Yeah, actually, in the motion, I also

21  attach the copy of the exhibit I'm sharing with you today in

22  the motion for the (indiscernible).

23       THE COURT:  I don't know that there were any

24  attachments to any of the motions that are --

25       THE DEFENDANT:  Yeah, I think I attach the

1      screenshot, but I have a copy, which I brought with me.  That's

2      what I was showing you right know.

3                THE COURT:  Okay, have you provided that to the

4      Government?

5                THE DEFENDANT:  Not yet.

6                THE COURT:  Okay, let me let you do that.

7           (The Defendant confers with counsel)

8                MR. TAYLOR:  Your Honor, my understanding of the

9      Rules of Evidence in the hearing of this nature are somewhat

10     relaxed.

11               THE COURT:  In fact, they don't apply.

12               MR. TAYLOR:  They don't apply.  Right.

13               THE COURT:  Yeah.

14               MR. TAYLOR:  This evidence of the documents I should

15     say, this is not what the Government presented at the hearing.

16     This has got a lot of markings on it.

17               So, I mean, I guess I have no objection to coming in

18     just for whatever consideration you might give them, but I

19     mean, this is not the same original evidence that's presented

20     at the hearing.

21               THE COURT:  This is not --

22               MR. TAYLOR:  For what it's worth.

23               THE COURT:  What you're saying is that -- what you've

24     just been handed by Mr. Bello are documents that were not used

25     or --

1          MR. TAYLOR:  Or rather of course, it did have its

2    (indiscernible) on it.  And I don't have -- I guess I didn't

3    bring that because I didn't know exactly what we're going to be

4    discussing here today.

5          THE COURT:  Sure.

6          MR. TAYLOR:  I mean, I have no objection to

7    you -- them coming into evidence for your consideration for

8    whatever -- however you want to treat it.

9          THE COURT:  Yeah, I think I'll accept them.  I'll

10   accept anything that want -- that Mr. Bello wants to submit to

11   the Court.

12         THE DEFENDANT:  Your Honor, I have the pre-trial, the

13   one that was used against me in the --yes, Your Honor, yes.

14         MR. TAYLOR:  May I approach, Your Honor?

15         THE COURT:  Yes.

16         THE DEFENDANT:  Okay.  Yeah, one more thing.  Give

17   this to the -- case.  This is the one that was used.

18      (The Defendant confers with counsel)

19         MR. TAYLOR:  Approach, Your Honor?

20         THE COURT:  Yes.  Okay, are there any other documents

21   that you want to submit to the Court, Mr. Bello?

22         THE DEFENDANT:  This is the one that (indiscernible)

23   doesn't have -- he doesn't know those two numbers.  This is the

24   139 for the pre-trial revocation, the 139.  And also, this is

25   the (indiscernible) okay, page 3 of 139, where he doesn't know

 1   about the number.

 2           MR. TAYLOR:  Your Honor, if I may, does the Court

 3   have at its disposal the ability to look at Document 139 on its

 4   own so -- he's pulling pages from that to refer to.

 5           THE COURT:  Okay.

 6           MR. TAYLOR:  I sense the Court may have that.

 7           THE COURT:  So this is Docket 139 in this case.

 8           MR. TAYLOR:  Yes.  Yes.

 9           THE COURT:  Give me a minute here.

10           MR. TAYLOR:  He's trying to refer to allegations from

11   the Government in that document, but if the Court has its own

12   version of the document, that might (indiscernible).

13       (Counsel confers with the Defendant)

14           THE COURT:  Okay, so tell me the docket number again?

15           MR. TAYLOR:  Docket 139, Your Honor.

16           THE COURT:  139 is --

17           MR. TAYLOR:  Is the --

18           THE COURT:  An order of detention?

19           MR. TAYLOR:  Yes, sir.  And there are pages in there

20   where I guess the Court or the Government has cited certain

21   things that Mr. Bello has disagreements with and would like to

22   go through those.  Rather than hand each page to the Court, I

23   think the Court can go through as he goes through it.

24           THE COURT:  Maybe I'm just not understanding.  This

25   is an 11-page document that's an order.  I don't see anything

1    attached to it.

2            MR. TAYLOR:  Oh, no, what I'm looking at it's an 11-

3    page document, Your Honor.  Yes.  He has issues with some of

4    the statements that are contained in that order.

5            THE COURT:  Okay, but you've handed me several pieces

6    of paper here.  You're not -- I thought you were saying that I

7    could find all of this in this docket entry.  That's not the

8    case?

9            MR. TAYLOR:  No, that was from before.  What he's

10   trying hand now is various pages from Document 139.

11           THE COURT:  I see, okay.  So to the extent that, Mr.

12   Bello, you're trying to point to printed out pages of Docket

13   139, you don't need to offer those because I have that pulled

14   up and can see that.

15       (Counsel confers with the Defendant)

16           MR. TAYLOR:  Your Honor, may I have the

17   (indiscernible).

18           THE COURT:  Sure.  And if we need to make more copies

19   of those?

20           MR. TAYLOR:  Yes.

21           THE COURT:  Okay, yeah.

22           THE DEFENDANT:  Thank you, thank you.  Your Honor, I

23   have a blow up a 139 because also the main focus on the 353 was

24   altered tampered evidence that was used against me for the

25   pre-trial revocation.

1          So what I would do to go right one more time to Your

2    Honor, I would go for the 1 -- Docket 139.  And I would refer

3    to that also in the evidence I have here.

4          THE COURT:  Okay.

5          THE DEFENDANT:  So I'll give it to Your Honor.

6    Should I go on, Your Honor?

7          THE COURT:  I'm sorry, Mr. Bello?

8          THE DEFENDANT:  Should I go on, Your Honor?

9          THE COURT:  You can proceed with your argument.

10         THE DEFENDANT:  Okay, now on the (indiscernible) if

11   you look at page 3 of the Docket 139, the last line, it says

12   Sabur -- nobody informed law enforcement that he received or

13   saw text messages from two phone numbers,

14   23737 -- 2347063762770 and 2349019351185.  Both which were

15   unknown to him.

16         Okay, now moving further on that, if you go to page 5

17   of the docket, I believe paragraph 2, it says for

18   (indiscernible) review of WhatsApp text messages reveal

19   Defendant communicated with two (indiscernible) message.  And

20   at the same time was 10 message and 2770 is message when it

21   find in a group chat, which (indiscernible) evidence.

22         So that statement was a lie because it cannot be in a

23   group chat (indiscernible) (indiscernible) training for 24

24   people and the event the fellow they contacted was from Nigeria

25   was an instructor for Sabur.  He was a tutor for Sabur.  So

1    they knew each other before.  There was previous communication

2    between each other than before.

3            So now, I'm going back again now to page 4.  The

4    Government used there were some messages presented was

5    incomplete messages.  They just pick whatever good to them.

6            And go to 106.  No, hold on.  I have it somewhere.

7    It's -- I don't (indiscernible) the (indiscernible) evidence,

8    they cannot use it for complete messages because if you just

9    speak up (indiscernible) to you, nobody know what is going on.

10   But in the discovery they give to me, I was able to figure out

11   more of really going on.

12           So that was when I figure out the messages that were

13   used against me at the pre-trial revocation was altered.

14   Because the Government presented the printout of the WhatsApp

15   messages that was used against me.  Then I was able to go

16   through all the messages within the two of them.

17           That was when I -- the other one I want to show you

18   the discrepancy and inconsistency in the messages.  So now the

19   talk of the matter on this first page the -- I have in the

20   discovery, it shows that these two messages that contacted

21   Sabur, they have the number here.

22           On one -- on your on your phone, when you use

23   WhatsApp, if you look at the screenshot, you would take the

24   last dates you made the contact with anybody.

25           And now, Sabur said before that the message, an

1      interview they had with Sabur, it say your message was deleted.

2      When I forwarded it, I took a screenshot and I forwarded it to

3      my wife.

4              Meanwhile, his wife was in Nigeria just 15 minutes

5      away from the contact person at that time.  Sabur's wife was in

6      Nigeria at that time.

7              So now on the screenshot, nobody -- I don't know who

8      owns this phone, who have this phone, because I'm a software

9      engineer and anybody -- I mean, there was messages used by

10     everybody in the company.  They use it to contact the customer.

11     So I'm not too sure who using the phone at the time.

12             You know, WhatsApp these days, you can be on your

13     laptop and use it and you can (indiscernible) phone and use it.

14     Doesn't mean use on your cell phone.

15             So now this screenshot, I'm not too sure.  It was

16     taken from the laptop or was taken from his cell phone, but if

17     he say he forwarded the messages to his wife as claimed in the

18     interview, it would show in the list of people that had the

19     last contact.  With his wife (indiscernible).  There's only two

20     people which were the two people that contacted Sabur from

21     Nigeria.

22             Now moving forward, (indiscernible) messages.  What I

23     do was I went through all the printout they give to me.  And I

24     look at the -- what they did, they did not actually have the

25     whole message in one page like they took the (indiscernible)

1    page one and continuation and the other one for the

2    (indiscernible) text message.

3              So I look at the time stamp one by one.  And I read

4    all the messages one by one.  And I was able to compare few

5    screen together and I realize they were altered messages.  They

6    were not in original.  Someone changed the messages.  I'm not

7    too sure what (indiscernible) way or was altered.

8              Now that's what I will show you.  Like on this one

9    here, this two share the same messages.  These two messages

10    that share messages right.  Now when I did by them 810, 810,

11    meaning that the same messages.

12              But on one, even though they did alter, they made a

13    mistake.  They did not (indiscernible) the alteration.  One say

14    A-S-G -- A-S to assure, I assure you I am not trying to sell

15    you.

16              Now the other one say I assure you I'm not trying to

17    sell you.  But on one, the assume is spelled A-S-U-U-R-E.  On

18    the other one, they are showing spell A-S-U-R-E.

19              THE COURT:  Okay.  It is your argument that this

20    evidence was used to obtain a warrant against the search?

21              THE DEFENDANT:  It was used to revoke my pre-trial.

22              THE COURT:  Uh-huh.  Okay.

23              THE DEFENDANT:  This they used to revoke my

24    pre-trial.

25              THE COURT:  And so, why are we talking about that

1     here in a suppression hearing?

2            THE DEFENDANT:  Now it's a motion to suppress the

3     evidence was an altered evidence.  It was not in the

4     originality.  It was part of my discovery.

5            THE COURT:  Uh-huh, okay.  Let me ask you about

6     something else if I could.

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  And that's about the agents asking you to

9     tell them your passwords for your devices.  Is that -- are you

10    saying that -- what were you saying happened with that?

11           THE DEFENDANT:  Oh, that was a different motion

12    unless you want us to -- because I just focused on 353 now.

13    Then we can go to that motion (indiscernible) as well.

14           THE COURT:  It's one of the three motions that we're

15    here on today?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  I'd like you to address that.

18           THE DEFENDANT:  Yeah.  When they -- after they call

19    me or interview me and I invoke my right to the attorney, they

20    put me to my computer home office and compel me to produce my

21    password to my phone.

22            So after they got the password, it was

23    (indiscernible) was work with the assistant who wrote the

24    password down on all the laptops.  And they took my phone away.

25    So two months later (indiscernible) phone back and all they

1    pick me up for the pre-trial revocation.

2            Now they took this phone away and I was looking at

3    the discovery, they had (indiscernible) from my house where

4    there was no (indiscernible) from my phone.

5            At the same time, I don't see any -- I did not

6    consent for them to probe my phone to -- they probe my phone

7    into one company Cellebrite.  And they brought over -- they

8    dumped all the information they dumped out of my phone.

9            Now in the Cellebrite reports (indiscernible) I have

10   the copy of the Cellebrite here that showed

11   the -- (indiscernible) reporting was January.  I have the copy

12   of the Cellebrite report here.  And that was on 354.

13           THE COURT:  Okay, do you understand what I'm asking

14   you?  The -- I'm asking you about whether you were compelled to

15   tell anybody what your passwords are?

16           THE DEFENDANT:  Yes, I was compelled and coerced to

17   produce my password.

18           THE COURT:  Okay.

19           THE DEFENDANT:  After I invoke my right to the

20   (indiscernible).

21           THE COURT:  Okay, tell me a little bit more about the

22   facts of that, how that happened?

23           THE DEFENDANT:  After the interview, when I revoke my

24   right, they took me to the back of my house and I

25   (indiscernible).

1        So they went to my office and they (indiscernible) I

2   should produce my password, what's my password.  And I was

3   (indiscernible).  I didn't know what was going on.  So they got

4   my password and that's how they got my password and they took

5   my phone away from there.

6        THE COURT:  Okay, one other question I had just from

7   reading the papers that you filed is whether you're saying that

8   some of the evidence identified in the search warrant, I think

9   this maybe goes to a car title, it's in computers.

10        THE DEFENDANT:  Yeah.

11        THE COURT:  There was not -- I heard you saying that

12   was not seized?

13        THE DEFENDANT:  Yes, Your Honor.  When they came to

14   my house --

15        THE COURT:  Just let me make sure I understand.  If

16   you're talking about evidence that was not seized, how could

17   that be part of a motion to suppress?

18        THE DEFENDANT:  Now, I put a motion to suppress

19   because they (indiscernible) for the IP address.  Now when I

20   was going through my discovery, they subpoena AT&T.  So the

21   Government know my house is not all night.  It's a data center

22   because my house, I have a lot of like I worked -- I used my

23   company bring their computer to my house.  So I host some of

24   them.

25        So in this search warrant they have, they're supposed

1    to pick up every alleged premise computer in my house.  When

2    you come to my house, (indiscernible) we go we have

3    (indiscernible) box like the fire escape for the TV.  We have a

4    (indiscernible) like that.

5          We also (indiscernible) watch TV, movie just more

6    like we have it's NetFlix fashion.  (Indiscernible) all those

7    (indiscernible) in my house.

8          Now prior to that, in their house in Missouri

9    (indiscernible) data center, but after I paid my house 2018, my

10   house was (indiscernible).  So we were able to get it

11   (indiscernible) from AT&T.  So I did had the contract with AT&T

12   to provide the IP address and a fiber, not online fiber, for

13   the data center in my house.

14         So all of those computers were in my house

15   (indiscernible).  So when they came to my house with the search

16   warrant, they saw the servers.  They didn't pick it up.

17         Now it's one of the probable cause.  Now

18   (indiscernible) they tell you to the grand jury that this house

19   is a data center.  They (indiscernible) day, but they did not

20   (indiscernible) the testimony before the grand jury.

21         So they came to my house.  They saw the server.  They

22   didn't pick it up.

23         Now in the indictment on the (indiscernible) for the

24   (indiscernible) even in that many when it's (indiscernible)

25   Dutch (phonetic) told them the trouble (indiscernible).  The

1    tattoo is a data technology.  That (indiscernible) because if

2    anything happen for the servers, there'll be a response time

3    faster.

4           So when they went through all the tattoo, they didn't

5    pick it up.  The server did not pick it up as well.

6    (Indiscernible) probable cause to come to get a search warrant.

7    So they did not fulfill the obligation for the search warrant.

8           THE COURT:  Okay.  Is there anything else you want to

9    say in support of any of your three motions to suppress?

10          THE DEFENDANT:  I talk about the search warrant to my

11   phone, they don't have that.  They broke my phone to Cellebrite

12   after (indiscernible).  I have the paperwork for that

13   (indiscernible) where it shows that the port was generated for

14   the cell phone.

15          And the -- you know, though they took the cell phone

16   away, they put the cell phone back and they continue, they have

17   access to my information based on the report I have in my

18   discovery, Your Honor.

19          THE COURT:  Okay, anything further from you?

20          THE DEFENDANT:  I have a bunch of evidence here as

21   well, which I don't know if you would need that?

22          THE COURT:  Well, today again, we're limited to the

23   three motions to suppress.

24      (Counsel confers with the Defendant)

25          THE DEFENDANT:  Your Honor?

1            MR. LINDER:  A few more things, Your Honor.

2            THE DEFENDANT:  This is on the 357, which is a motion

3    to suppress the material phone on the cell phones because the

4    scope of consent did not encompass the (indiscernible) date, a

5    motion to dismiss (indiscernible) U.S. (indiscernible) 5 and 4.

6    So I have it in the motion as well, which is on 357.

7            THE COURT:  Okay, I'm sorry, you're trying to submit

8    more evidence in support of motion 357?

9            THE DEFENDANT:  Yeah, this is the evidence to show

10   they connected my phone without a search warrant or my consent

11   later to the --

12           THE COURT:  Okay.  I'm going to let Mr. Taylor take a

13   look at that.

14           THE DEFENDANT:  Sure.

15           THE COURT:  And then, I'll accept it if you want to

16   provide it to the Court.

17           MR. TAYLOR:  No objection to (indiscernible).

18           THE COURT:  Mr. Bello, I do want to clarify one thing

19   that I asked before.  And I just want to make sure.  I am

20   having some trouble hearing you about you being asked for your

21   passwords.  Was that something that an agent told you you had

22   to provide or told you that you could provide if you wanted?

23           THE DEFENDANT:  No, because he asked me to produce

24   the password.

25           THE COURT:  He did what?

1          THE DEFENDANT:  He asked me to produce the password

2    or asked me and asked after I invoked my right to the counsel.

3          THE COURT:  Okay.  Okay, so you'll be handing me

4    through Mr. Linder's exhibits that you want me to consider.

5    I've heard your argument on the motions.  Is there anything

6    else you want to add?

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  Okay.  So I'll turn this over to the

9    Government now.  And typically, we let you put on your witness.

10   I think in think in this situation, if there's

11   cross-examination that you want to do this because Mr. Bello

12   has both argued his motions and testified in support of them,

13   you can do that.  And then call your witness unless you want to

14   proceed a different way.

15         MR. TAYLOR:  That is fine, Your Honor.  Could

16   I -- Mr. Bello, you mentioned Docket 139.  Can I just take a

17   moment to review that?  Because I didn't have access to it.

18         THE COURT:  Sure, that's fine.

19         MR. TAYLOR:  Do you have 139?

20         THE DEFENDANT:  Yeah, 139.

21      (Counsel confers with the Defendant)

22         MR. TAYLOR:  Your Honor, would you like me to stand

23   at the lectern to conduct cross-examination or?

24         THE COURT:  Yeah, I think it would be appropriate to

25   the extent you're cross-examining Mr. Bello for Mr. Bello to

```
 1        have a seat in the witness chair.

 2                 MR. TAYLOR:  Okay.

 3                 THE COURT:  So, Mr. Bello, if you could come up here

 4        and because you're playing a dual role in this case, this will

 5        be a chance for the Government to cross-examine you to the

 6        extent that you've testified today in support of your motions.

 7                 MR. LINDER:  Your Honor, may I stand next to Mr.

 8        Bello so (indiscernible)?

 9                 THE COURT:  Yes, please.

10                 And Mr. Taylor, you can proceed when you're ready.

11                 MR. TAYLOR:  Thank you, Your Honor.
```

**CROSS-EXAMINATION**

```
13        BY MR. TAYLOR:

14        Q    Good afternoon, Mr. Bello.  You understand that

15        because you've elected to testify in this case, that you're now

16        subject to cross-examination and the rules -- I mean, there are

17        no Rules of Evidence, but just kind of a natural flow of things

18        and sort of things I'm allowed to get into are to ask questions

19        about to follow up about you said in addition to asking you

20        questions regarding your credibility.  Do you understand that?

21        A    Yes.

22        Q    Okay, okay, you covered a lot of material during your

23        direct.  So I just want to kind of to try to break this up in

24        chunks.

25            So let's start with what's docket entry 353.  And I kind
```

1    of want to just make sure I understand exactly what the

2    argument is.  And I've got a few questions once I think by

3    getting better footing about what you're trying to say.

4         So last actually two August ago, August 2023, we had a

5    hearing in this courtroom on a revocation of your pre-trial

6    release; is that right?

7         A    Correct.

8         Q    And at that time, you were represented by counsel;

9    isn't that correct?

10        A    Correct.

11        Q    And that was before you decided to proceed pro se.

12   And your counsel at the time was who?  Frank Thompson?

13        A    I can't remember.

14        Q    You don't remember.  I think it was Frank Thompson.

15        A    (Indiscernible.)

16             THE COURT:  Mr. Bello, please make sure you're

17   speaking into that microphone.

18             THE DEFENDANT:  I can't remember this name.  Frank,

19   Mr. Frank something.  Yeah.

20   BY MR. TAYLOR:

21        Q    Okay.  If I represent to you it's Frank Thompson, you

22   wouldn't have any reason to dispute that?  I guess my point is

23   that you had an attorney at that hearing; isn't that right?

24        A    I had what?

25        Q    You had an attorney to represent you at that hearing?

1        A    Correct, correct.

2        Q    Okay.  And do you recall that the allegations were

3    that you had violated the conditions of your pre-trial release?

4        A    Correct.

5        Q    Because you were arrested back in June of 2023, but

6    released on bond; isn't that right?

7        A    Correct.

8        Q    Okay.  And do you recall the Government presenting

9    evidence in the form of some WhatsApp messages?

10        A    I was what?

11        Q    Do you recall the Government presenting some evidence

12    in the form of WhatsApp messages?

13        A    Correct.

14        Q    Okay.  You mentioned the name in your direct

15    examination Sabur Yusuff?

16        A    One of the co-defendant, Sabur Olawale Yusuff

17        Q    Okay, who is Sabur Yusuff?

18        A    He's one of the co-defendant and the Government

19    witness that presented the information used against me

20    according to the 139.

21        Q    Okay.  How do you know Sabur?

22        A    Sabur was affiliated to corporation who was a

23    customer to a corporation I'm affiliated with.

24        Q    Okay.  So Sabur Yusuff was one of your former clients

25    or customers?

1        A    Not my client.  Sabur was one of the (indiscernible)

2    client.  Sabur was an affiliated to a corporation who was a

3    customer to a corporation I'm affiliated with.

4        Q    Okay.  So sorry let me just make sure I understand.

5    You said Sabur Yusuff owned a company --

6        A    Uh-huh.

7        Q    -- that was a customer of one of your companies?

8        A    No.  Sabur owns a company, S-O-Y.  S-O-Y was a

9    customer to Ajide Technology.  So I am a consultant also, what

10   do you call it, a representative for Ajide Technology.

11       Q    Okay, so Sabur owned a company, S-O-Y, right?

12       A    S-O-Y.

13       Q    You have a -- you're affiliated with a company Ajide?

14       A    Yes.

15       Q    And S-O-Y --

16       A    Customer.

17       Q    -- was a customer of Ajide?

18       A    Ajide.

19       Q    Okay.  So you knew Sabur before the hearing last

20   August?

21       A    I knew Sabur before the hearing through the company.

22       Q    Okay.  Now you understand that the evidence presented

23   was provided by Sabur Yusuff to the Government?

24       A    Correct.

25       Q    You're not contending -- this is a Court.  You're not

1    contending that the Government obtained that message from you?

2        A    Not from me.

3            MR. TAYLOR:  Okay.  So, I mean, I think that pretty

4    much ends the inquiry there unless the Court would like to hear

5    more on this issue.  I may ask a couple more questions.

6            THE COURT:  Yeah, so just to make sure I understand

7    what's happening.  You're cross-examining Mr. Bello to the

8    extent that he testified today on his own behalf.

9            MR. TAYLOR:  Right.

10           THE COURT:  And then you may call another witness.

11           MR. TAYLOR:  Right.

12           THE COURT:  And that after that, I'll take argument

13   on any and all of what's happened today at the hearing, so you

14   can explain to me everything, how everything fits together in

15   the Government's view?

16           MR. TAYLOR:  Right, I'm just trying to take this kind

17   of like one motion at a time.

18           THE COURT:  Okay.

19           MR. TAYLOR:  So I'm just kind of going through one

20   motion briefly through first.

21   BY MR. TAYLOR:

22       Q    And I just want to make clear that you're telling the

23   Court that you're basically admitting that the evidence on the

24   WhatsApp messages did not come from you, right?

25       A    I'm admitting that I have (indiscernible) my

1    discovery and I was able to go to the evidence in my discovery.

2    And now I realize that everything used against me was alter

3    before they present it to the Court.

4        Q    Okay, but that's not the question.  The question is

5    did the Government seize the evidence from you or did the

6    Government get this evidence from Sabur Yusuff?

7        A    I'm not too sure where the Government get it from,

8    but based on what they said in the 139, it said the information

9    was presented to the Government from Yusuff.  139 say.

10       Q    I just want -- I'm just trying to -- I've kind of got

11   two jobs here, kind of like, number one, just to make sure I

12   understand what you're arguing.  And number two, to kind of vet

13   that argument.

14       So, number one, I want to just be clear that you're not

15   arguing to the Court or anybody that the evidence that was

16   presented at hearing, that the Government seized that evidence

17   from you or anything that you had an interest in?

18       A    On this motion, 353, I argue not that.  I'm argue

19   about everything used against me --

20       Q    Okay.

21       A    -- from the discovery presented to me.

22       Q    Okay, so is the answer no?

23       A    Everything was not from me.

24       Q    Okay.  Okay, and you had the opportunity to cross-

25   examine the Government's witness, right?

1        A       Sure.

2        Q       To the counsel.  And if we decide -- if the

3    Government decides to put on that evidence at trial, do you

4    understand you'll also have the opportunity to cross-examine

5    the sponsoring witness and to argue to the jury the veracity of

6    that evidence.

7        A       Sure.

8        Q       Okay, and I don't know how important this is, but I

9    just want to make clear I understand what you're saying.

10   You're comparing to make your argument that the message is

11   altered, you're comparing some of the language in the Court's

12   order with the original evidence; is that correct?

13       A       No, I'm saying in the discovery because the evidence

14   provided during my revocation was incomplete messages.  So in

15   the discovery, I had (indiscernible) to go over all the

16   complete messages, that was where I find out the messages, the

17   evidence was used was not in the original form.

18       Q       Okay.

19       A       It was altered.

20       Q       All right, I think we're about ready to move on from

21   this particular issue.  Suffice it to say that you're admitting

22   that the evidence from Sabur Yusuff didn't come from you,

23   right?

24       A       Correct.

25       Q       In that you have the ability to cross-examine

 1    whatever witness the Government made attempt to get the

 2    evidence into a trial just like you did at the revocation

 3    hearing?

 4         A    Correct.

 5         Q    Okay.  Okay, I think I heard you mentioned something

 6    about the use of force to enter your home; is that correct?

 7         A    Yeah, yes, and about that, too, which they can

 8    produce the camera of when they get into the house.

 9         Q    Okay, so I just need to make sure I have your

10    testimony correct.  Did you testify under your oath that you

11    were the one who answered the door when the agents showed up?

12         A    Yes.

13         Q    Okay, and what happened after you heard the knocking?

14         A    I answered it.  I got to the door.  I unlocked the

15    door like to answer (indiscernible) and lift a crack on the

16    frame of my door.  It's (indiscernible) up to now.

17         Q    So you're contending that the law enforcement agents

18    that executed the search warrant --

19         A    No, (indiscernible) forced entry.

20         Q    Okay, and how did they do that?

21         A    You go in there, unlock the door.  I already unlock

22    the door.  They force the door open for --

23         Q    Not saying they kicked the door open, used a battery

24    ram?  What do you mean?

25         A    They forced the door open.  I don't how they kicked

1   with their hand (indiscernible) or through the forced entry

2   they let the crack on the frame, but I already have the door

3   unlocked.

4         Q    They --

5         A    But open the door, I'm coming because I comply with

6   the -- everything.

7         Q    You already had the door unlocked?

8         A    No, no, no, I -- no, I had it unlocked already,

9   right?  You know, it's a latch.  You unlock it.  So they could

10  have opened the door and I would have my (indiscernible).  If

11  they have it coming at the (indiscernible) the camera footage

12  of how they get into the house, that would really explain

13  everything.

14        MR. TAYLOR:  Okay, can we pull up a photo, it's

15  Government's Exhibit Number 3?  Your Honor, should be a binder

16  there with both paper and electronic copies of the --

17  BY MR. TAYLOR:

18        Q    Do you recognize Government's Exhibit 3?

19        A    Yes.

20        Q    What is it?

21        A    My front door where they're coming through.

22        MR. TAYLOR:  Okay, do you see the necessity to offer

23  Government's Exhibit 3 into evidence, Your Honor?

24        THE COURT:  It'll be admitted, yeah.

25        (Plaintiff's Exhibit 3 admitted into evidence)

 1            MR. TAYLOR:  Okay.

 2     BY MR. TAYLOR:

 3        Q     Would it surprise you, Mr. Bello, this is a photo

 4     taken of your front door after the agents left the search

 5     warrant?

 6        A     Correct.

 7        Q     Okay, doesn't appear to be damaged, does it?

 8        A     No.  How can you frame?  Don't frame.  You have to

 9     open the door and see the crack in the frame.

10        Q     Okay.

11        A     It's (indiscernible).  We haven't got the money to

12     physically (indiscernible).

13        Q     Okay.

14        A     And (indiscernible), we'd be better to slide the

15     (indiscernible), not to the picture.

16            MR. TAYLOR:  Okay, you can take it down.

17            Your Honor, I'd like to just kind of focus on the

18     issues that Your Honor's going to need to -- the factual issues

19     that the Court will resolve, not explicitly for this.  I think

20     can be resolved purely on legal grounds.

21            If the Court thinks otherwise, I can explore it

22     further.  I mean, I'll just maybe (indiscernible) would make a

23     small argument here just to say why, that I don't think

24     that -- I think the case law is pretty clear that forced

25     entry -- I mean, we dispute that that even happened, but it's

1    not an issue of suppression.  It both under the common law and

2    the statutory law.  It's not a suppression issue.

3         The Government disputes that there was forced entry,

4    but even if there were, it's not a suppression issue.  So I

5    just kind of insert that small argument, so if there are more

6    questions --

7         THE COURT:  Sure.

8         MR. TAYLOR:  -- that the Court would like to explore

9    factually, I can do that, but otherwise, I just want to move

10   on.

11        THE COURT:  Okay, so the -- assume for a minute that

12   he has a valid claim about the forced entry.  What would be the

13   proper way for him to vindicate his rights on that?

14        MR. TAYLOR:  I think there's a potential civil remedy

15   available.  I noted in my brief, Your Honor, try to find a

16   specific reference.

17        Okay, I just note that on page 5 of the Government's

18   response, the justice's second argument, there's 5th Circuit

19   case law essentially laying out that a violation of either the

20   Fourth Amendment knock and announce requirement or the

21   statutory knock and announce requirement under the

22   United -- like 18 United States Code §3109, the exclusionary

23   rule is inapplicable to any violation.

24        I'm not here to give legal advice.  I think there may

25   be a civil remedy available, but at least for purposes of

 1    suppression, that's just not --

 2              THE COURT:  Okay.

 3              MR. TAYLOR:  -- assuming that it even happened, it

 4    wouldn't be a suppression issue.

 5              THE COURT:  Okay, let me let you wrap up your --

 6              MR. TAYLOR:  Yeah.

 7              THE COURT:  -- your cross-examination.

 8              MR. TAYLOR:  Yeah.

 9              THE COURT:  And then, we can move on.

10              MR. TAYLOR:  Right, I just wanted to -- if the Court

11    wanted more facts on that, I would offer them.  But if not, I'm

12    just going to go on to another issue.

13              THE COURT:  Sure.

14    BY MR. TAYLOR:

15         Q    Okay, you -- I'll just -- you made some points about

16    what was not seized from your house, Mr. Bello, is that right?

17         A    Correct.

18              MR. TAYLOR:  I'm probably not going to need to delve

19    any further unless the Court would wish me to.

20              THE COURT:  Okay.

21    BY MR. TAYLOR:

22         Q    Okay, let's talk now about the statement you made

23    regarding the request or the way that the Government got your

24    passcodes to your phone.  Tell me more about that?  Where were

25    you whenever the agents entered the home and approached you for

1    an interview?

2        A    I was actually in bed.  Then I came to the door.  And

3    they take me to the back of my house.  And they were starting

4    the interview.  Then I invoke my right to the counsel.  Then --

5        Q    Okay, okay, let me stop you right there --

6        A    Okay.

7        Q    -- because you said you went to the back of the

8    house.

9        A    Back of my house.

10       Q    And there's some agents with you there to interview;

11   is that right?

12       A    The SBA agent and (indiscernible).

13       Q    Okay, and at that time, did they present to you

14   what's called an advice of rights form?

15       A    They never -- they never give me consent form in

16   anyway.

17       Q    Okay, I'm asking about a consent form.  I'm asking

18   about it's a different thing, an advice of rights where they

19   basically tell you all of your rights under the Fourth

20   Amendment and other constitutional law.

21       A    Yeah, they told me at any point I can invoke my right

22   to the counsel and they will stop.

23       Q    Okay.

24       A    So they did, and I invoke my right, and they stopped.

25       Q    Okay, so you sat down at the table with the agents

1    and they started asking you questions after you had waived your

2    right, your rights?  There's a point that you talked to them?

3         A    No, no, no, before I asked for the counsel, they

4    started asking me question, but they made it clear to me that

5    at any point during the interview, I can invoke my right.

6         Q    Okay, let's stop right there.

7         A    Yes.

8         Q    They made that clear to you?

9         A    Uh-huh.

10        Q    And then, they started asking you some questions; is

11   that right?

12        A    He started asking me the question, yes.

13        Q    Okay, and you talked about several items for several

14   minutes; is that correct?

15        A    We talked for few minutes and I invoke my right.

16        Q    Okay, how did you do that?  How did you invoke your

17   rights?

18        A    I told them to stop, I need to -- I needed counsel.

19             THE COURT:  Okay, can I just make sure I understand

20   your testimony?  You heard the availability of your rights and

21   you talked to the agents for a couple of minutes did you say

22   before you invoked your right to counsel?

23             THE DEFENDANT:  Yeah, they tell me I have the right

24   to stop them at any time, but I didn't know what was going on.

25             THE COURT:  Sorry, yeah, just --

1           THE DEFENDANT:  Okay.

2           THE COURT:  Sorry, I just want to make sure I

3    understand.

4           THE DEFENDANT:  Okay.  So when they came to my house,

5    and they started -- because I didn't know what was going on.

6    So they try to tell me what was going on, was about the SBA.

7           So they would ask me a few questions, but they told

8    me before that time when during the interview, at any point I

9    can invoke my right and they will stop.

10          So when (indiscernible) asking -- when I know what

11   was going on, I was like I need right to the counsel and they

12   stopped.

13          THE COURT:  Okay, so you told them some things before

14   you invoked your right?

15          THE DEFENDANT:  Yes.

16          THE COURT:  And then some more things after you

17   invoked your right?

18          THE DEFENDANT:  After I invoke my right, they now

19   they stop.  Then they went to my office.  And that was when

20   they call me to the office and asked me for the -- compel me

21   for the password.

22          THE COURT:  Okay, I'll turn it back over to you.

23   BY MR. TAYLOR:

24     Q    Okay, so you're being asked some questions by the

25   agents and you're answering them at some point, correct?

```
 1         A     Yeah, before I invoke my --

 2         Q     And there's some discussion about a lawyer?

 3         A     Before I invoke my right.

 4         Q     Okay, and then at that point, you guys -- you and the

 5   agents stopped talking about anything related to the

 6   indictment; isn't that correct?

 7         A     No, they were talking about the SBA.  They were

 8   talking about why we're here.

 9         Q     Right, so the -- the indictment essentially -- you

10   read the indictment, right?  Essentially, it alleges that you

11   were in a conspiracy to fraud the Government by obtaining

12   fraudulent PPP and EIDL loans?

13         A     Correct.

14         Q     And so, at that point, any discussion about any loans

15   stopped?

16         A     No, and they didn't go too far, they didn't go too

17   far.  It's in the discovery was a brief interview.  Then I

18   invoked my right.

19         Q     Okay, and then at that point, isn't it true that

20   agents said we're taking you to jail, right?

21         A     They bring me to the -- back into the house.  I sit

22   by the dining table at the back of the house.  Then they walk

23   to my office for the -- because I had -- because I work from

24   home.  So I like -- I do like two to eight jobs sometimes.  So

25   there's bunch of computers there.  So they're pointing out
```

 1    which one is my computer, my laptop.

 2        And they asked me for my password.  The Court asked me

 3    compel me to produce my password.  So and he was writing it

 4    down.  So when (indiscernible) Rene and I'm not sure the name

 5    the officer, then he wrote it down.  Then he got all my

 6    password.

 7        Q    Okay, and then, before you went to the county jail,

 8    did -- was his issue that you asked to use your phone to get

 9    some numbers for your wife, a phone number for your wife?

10        A    I know my wife phone number.

11        Q    No, I mean, you wanted to provide -- you want to get

12    something off your phone?

13        A    I didn't -- we didn't talk about that.  So

14    they -- after that, they asked me for the password, you know,

15    that was it and we didn't talk about asking.  I didn't talk to

16    them after that.

17        Q    Did you access your phone?

18        A    Did they answer my phone?

19        Q    Access your phone?

20        A    No, they took my phone from me.

21        Q    When?

22        A    When they came into the house, again, the two phone

23    was in my hand.

24        Q    In your what?

25        A    The two phone was in my hand when I came out.  I

1    was -- it was on me when I came to the door.

2         Q    Okay.

3         A    So they took my phone from me.  So I don't have

4    access to my phone from that time.

5         Q    Okay, now you were released on bond like the next

6    day, right?

7         A    Correct.

8         Q    Okay.  And you want -- isn't it true that you wanted

9    your phones back at that point?

10         A    I didn't even ask for it.  You brought it back after

11    in August.  You brought it back.  I didn't ask for it.  I

12    needed my phone because I work from home.  So I -- company I

13    work for, the app, I don't have a phone because I always -- so

14    they brought the phone back.  I didn't ask.

15         What I asked for the key, for the key for the house

16    (indiscernible) key, my wife called me for the key

17    (indiscernible) taking the truck.  That's the reason why my

18    wife contacted me for the key.

19         Q    I'm going to stop you right there, because I think

20    we're getting far afield from the question.  At some point, did

21    you contact Agent Renny asking for you phones back?

22         A    No, I didn't contact him.

23         Q    You didn't?

24         A    My wife did contact for the key.

25         Q    Okay, I'm talking about the phones?

1    A    No, I didn't (indiscernible) for the phone.  They

2    brought the phone back.

3    MR. TAYLOR:  Okay, well, can I just submit it, Your

4    Honor?

5    THE COURT:  Sure.

6    BY MR. TAYLOR:

7    Q    Okay, let's focus on the iPhone.  There were several

8    devices that the Government took from your house, am I right?

9    A    Correct.

10    Q    Okay, let's talk about iPhone.  What -- can you

11    describe the make, model -- the make and model of the iPhone?

12    A    No, no, I can't remember.

13    Q    You don't know?

14    A    I can't remember, so.

15    Q    Okay.

16    A    Yeah.

17    Q    Fair enough.  But suffice it to say that like they

18    took it from you while it was in your hand?

19    A    Yeah, they took it from me.

20    Q    You don't deny it's your phone?

21    A    No, that phone is a company phone.  So if you look at

22    the -- all the contact for Ajide and the web or the software we

23    used, it was in the discovery.  They were all APIs.  They use

24    API.

25    And also the application for the software, you can see on

 1    the phone as well.  So it's -- you can online and see the

 2    number (indiscernible) so many companies.  So they were company

 3    phones.  They use it for software so.  A few other phones too

 4    as well (indiscernible).

 5         Q    Were you -- excuse me, were you using the phone

 6    before the I-agents came to the door?

 7         A    No, I wasn't using the phone.  I just woke up.  I

 8    came to the door with the two phones in my hand.

 9         Q    Okay, you had two phones in your hand?

10         A    Yes.

11         Q    One's an Apple iPhone, right?

12         A    One is I think Samsung.

13         Q    Okay.

14         A    One's a free phone and the iPhone.

15         Q    An iPhone?

16         A    Yes.

17         Q    Which one's your personal, which one's your work

18    phone?

19         A    I don't have a personal phone.

20         Q    What?

21         A    I don't have personal phone.

22         Q    What were you using the phones for?

23         A    Software.  We build software.  I'm the only one using

24    the phone.  You can go online and look at it.  We have API.

25    Even in discovery, you even produce all the API keys.  We are

1    given model phone what you took from the house.

2        I'm a software engineer.  I do software.  We use it for

3    every platform.  Go to the Play Store.  Go to the iOS Store.

4    All the softwares are there.  (Indiscernible) Nigeria, do the

5    work in India, do the work in U.S.  They only use the phone.

6        Q    Okay, so you don't have a personal phone?

7        A    I don't have a personal.  I don't need it.

8        Q    Okay, but those are phones that you're using?  They

9    at least were in your possession?

10       A    They were in my possession.

11       Q    And you knew the passcodes for both of those?

12       A    I knew the passcode for both.

13       Q    Okay, isn't it reasonable that people know the

14   passcodes to the phones that they possess?

15       A    Now, I have a passcode because I ensure everything is

16   not being abused by the employers.  So when anyone can use the

17   software, they have to contact, make the right procedure to get

18   information any.

19       So everybody use it.  It doesn't have to be in their

20   physical presence.  We all know you can use it.  It wasn't only

21   laptop, but they can use the phone anywhere because we do

22   provide some service as well.

23       Q    Okay, so just to make sure I'm clear, Mr. Bello, the

24   phones belonging to some company, but not you personally,

25   right?

```
1        A    Not my personal.  We belong to the company, yes.

2        Q    Okay, so which company did own the phones?

3        A    Well, Ajide owns one.  And then Smooth

4   (indiscernible) the phone.  Smooth Ajide.  And they can even go

5   to the spring record because the -- you know, we don't use

6   a -- we do software, so we don't really use -- we use Spring

7   one time and we change over because Ajide (indiscernible) and

8   then my phone.

9        Q    Okay.

10       A    So it's not -- that's my phone.

11       Q    Okay, Ajide, that's a company, right?

12       A    Yes, it's a company.

13       Q    Which phone did Ajide own?

14       A    Ajide owned the iPhone.

15       Q    Ajide owned the iPhone?

16       A    Yes.

17       Q    Which phone did the company Smooth own?

18       A    Smooth own the Samsung phone.

19       Q    Okay, so neither of these phones are yours?

20       A    No.

21            MR. TAYLOR:  Okay, Your Honor, I may put on some

22   other evidence, but I just I don't want to belabor this

23   hearing.  If there are certain factual issues that Your Honor

24   would like to know further about to resolve the pending

25   motions, then we'll explore it with the Defendant, but
```

 1   otherwise I think I'm going to pass the witness.

 2           THE COURT:  Okay.  Yeah, I mean, I think a lot of

 3   this is going to come down to legal argument.  And so, I think

 4   if you have no further questions, Mr. Bello, you can step down

 5   from the witness stand and return to your spot at counsel

 6   table.

 7           And then, Mr. Taylor, you can call your witness.

 8           MR. TAYLOR:  I'm going to call Jason Redding.

 9           THE COURT:  Okay.

10                          JASON REDDING

11    called as a witness for the Plaintiff, having been duly sworn

12                       testified as follows:

13           THE COURT:  And you can proceed when you're ready.

14           MR. TAYLOR:  Thank you, Your Honor.

15                      **DIRECT EXAMINATION**

16   BY MR. TAYLOR:

17       Q    Agent Redding, can you please introduce yourself to

18   the Court?

19       A    Yes, my name is Jason Redding.

20       Q    How are you employed?

21       A    I'm a special agent with the FBI.

22       Q    Okay, how long have you been a law enforcement

23   officer?

24       A    Just over 20 years.

25       Q    What -- can you kind of run through the types of

1    crimes that you have investigated over the course of your

2    career?

3        A    I started in the Chicago field office where I

4    investigated Eastern European Russian organized crime.   In

5    2012, I moved to -- back to Texas, where I investigated violent

6    crime, kidnappings, bank robberies.

7        And since approximately 2015, I've been assigned to a

8    white collar squad, where I investigate complex financial

9    crimes.

10       Q    As part of your duties as an FBI agent, both in the

11   white collar crimes case and just generally, have you ever

12   received training and experience in forensic examinations?

13       A    Forensic examinations related to?

14       Q    Cell phones and computers.

15       A    Limited.  I've taken a few classes related to cell

16   phone examination.  I've taken -- I have some training related

17   to forensic examination of computers and mobile devices.

18       Q    Uh-huh.  Okay, let's just kind of get straight to the

19   important facts I think.  Are you the -- one of the case agents

20   involved in investigating the Defendant and alleged

21   co-conspirators?

22       A    I am.

23       Q    Okay.  Did you apply for a search warrant of the

24   Defendant's home and the contents therein?

25       A    I did.

1              MR. TAYLOR:  Okay Your Honor, I would offer

2    Government's Exhibits 1 and 2.  Is there a way to pull those up

3    for the witness to view the --

4         THE COURT:  There should be, yes.

5              MR. TAYLOR:  Yeah.  Let's go ahead and start with

6    Exhibit 1.  I'll offer Government's 1 and 2.

7              THE COURT:  Okay, and again, the Rules of Evidence

8    don't apply here, but --

9              MR. TAYLOR:  Right.

10             THE COURT:  Mr. Bello or Mr. Linder, are you okay

11   with these exhibits being presented?

12             MR. TAYLOR:  Do have copy provided in the notebook,

13   Mr. Bello and that the -- at least the first page is on the

14   screen there.

15             THE DEFENDANT:  No objection.  I see that.

16             THE COURT:  Okay, thank you.

17   BY MR. TAYLOR:

18        Q    Okay, let's take a look first at Government's Exhibit

19   1.  Is this the first page of the application for a search

20   warrant that you submitted to this Court?  Okay, and did you

21   submit that -- what day did you submit this application?

22        A    The application appears to be signed or was filed

23   with the Court June 14th of 2023.

24        Q    Okay.  And was that or to which judge was that

25   application presented?

1    A    The former magistrate judge of this Court, Ms.

2   Kimberly Priest Johnson.

3    Q    Okay.  And the Court can obviously review the

4   application on its own time, but just can you just kind of

5   generally tell us the kind of things that you were looking for?

6   What was the warrant for -- what kind of warrant were you

7   applying for and what were you looking for?

8    A    We were -- this was a search warrant for the

9   premises, Mr. Bello's residence, which we were looking for

10   documentation, which would -- evidence of a crime related to

11   loans or loans facilitated or the loans taken during the scope

12   of 19 pandemic related to Paycheck Protection Program or the

13   Economic Injury Disaster Loan programs.

14    Q    Okay.  In Attachment B to the application, were

15   mobile phones included as an item to be seized?

16    A    I believe, yes, mobile devices were included.

17    Q    Okay.  And what sort of authority also described in

18   Attachment B were you applying for?  In other words like what

19   were you asking to be allowed to look for?

20    A    Well, typically, I don't have Attachment B in front

21   of me, but it's white collar cases.  It's essentially

22   paperwork.

23    So paperwork is, you know, essentially in white collar

24   cases and paperwork related to loans, banking financial

25   information, transfers, communications.

1    So any of that information could, you know, anywhere that

2    information could be held within the location that's the target

3    of the search warrant could be searched pursuant to the

4    warrant.

5         MR. TAYLOR:  Okay.  If we could, Ms. Adams, go the

6    second to last page of Government's Exhibit A-1.  Okay, the

7    next one, please.

8    BY MR. TAYLOR:

9    Q    Okay, this is still in Government's Exhibit 1.  Can

10   you point out to the Court where you're asking for

11   authorization to seize mobile phones?  It's the middle of the

12   page.

13   A    Mobile phones, right.  So it's a -- I guess that

14   would be paragraph 3 including desktop computers, notebook

15   computers, mobile phones, tablets, server computers, and

16   network hardware.

17   Q    Okay, so that's the definition of computer, right?

18   A    Yes.

19        MR. TAYLOR:  Can we back up a few pages, Ms. Adams, to

20   where Attachment B begins?  It'd be 1033 in the Bates stamping.

21   Okay.

22   BY MR. TAYLOR:

23   Q    And so, in paragraph 2, is that where you're asking

24   to seize computers?

25   A    Correct.

1      Q    Okay, so look at where computers is defined term that

2    we just looked at including mobile phones; is that right?

3      A    Correct.

4      Q    And then here, we see that you've requested to seize

5    computers.  And then, in paragraph 1, can you talk -- tell us

6    the kind of records that you're asking to seize?

7      A    Records and information related to conspiracy to

8    defraud United States Small Business Administration, records

9    and information related to bank accounts, tax documents,

10    business records, communications with co-conspirators --

11      Q    Okay.

12      A    -- computers or storage media used as a means to

13    commit the violation described above.

14      Q    Okay.  So those are the things that you're asking the

15    Court to authorize you to seize; is that right?

16      A    Correct.

17           MR. TAYLOR:  And if we could go to Attachment A, Ms.

18    Adams?

19    BY MR. TAYLOR:

20      Q    Isn't it true that typically Attachment A in search

21    warrants describes like the general premises that's to be

22    searched?

23      A    It does.

24      Q    Okay, and what is this property that's described in

25    Attachment A?

1        A      Property in Attachment A is 22105 Dublin Court,

2   McKinney, Texas 75071, which is the investigation showed was

3   the primary address residence, which was owned and resided in

4   by the Defendant Mr. Bello.

5        Q      And just to kind of close the loop, if we can go to

6   Government's Exhibit 2.  What's Government's Exhibit 2?

7        A      It's the actual warrant itself.

8        Q      Okay.

9        A      It gives us the authority signed by the judge, the

10  magistrate judge, to execute the search warrant as described in

11  the application.

12       Q      Okay, so the application is your part, where you ask

13  for the judge's permission to execute a search.  And then in

14  the Government's Exhibit 2, it's the actual warrant, which

15  gives you the authorization?

16       A      Exactly.

17       Q      Okay.  All right, did you or did you end up executing

18  the search warrant?

19       A      We did.

20       Q      You and a team of other law enforcement agents?

21       A      Correct.

22       Q      When did you execute the warrant?

23       A      June 21st of 2023.

24       Q      Okay, so about a week after you got the warrant?

25       A      Correct.

1    Q    Okay, during the course of that search --

2    A    Oh, and I did want to correct.  It looks like the

3  warrant was filed on the 15th, but it looks like we received it

4  on the 14th.

5    Q    Okay.  All right, so during the execution of that

6  warrant, did you and your law enforcement team seize certain

7  electronic devices from this home?

8    A    We did.

9    Q    Okay, and was one of the items you seized an Apple

10  iPhone?

11    A    Correct.

12    Q    Okay, do you -- can you tell us the make and model of

13  that iPhone?

14    A    It's an -- it was an Apple iPhone 12 Pro.

15    Q    An Apple iPhone 12 Pro?

16    A    Yes.

17    Q    Okay.  Do you know the ISO (sic) that it was running,

18  the operating system.

19    A    The operating system it was running was 15.1.

20    Q    Okay.  All right, have you had discussions or do

21  you -- been able to discuss with let's talk FBI Lab about the

22  capabilities the lab would have to open an Apple Pro?

23    A    Yes.

24    Q    Apple 12 Pro?

25    A    Yes.

1      Q     Okay, and can you tell the Court kind of the process,

2   what the FBI Lab is, how you interact with them, and what

3   they're able to do?

4      A     Sure.  It's the North Texas Regional Computer

5   Forensics Lab.  And they have the -- they're a digital, an

6   accredited digital forensics lab.

7      And they have forensic examiners, essentially experts in

8   digital forensics, that assist not only the FBI, but they

9   assist state and local law enforcement related to devices,

10   especially mobile devices, computers, things like that.  So to

11   extract evidence in a digitally forensic way.  So they have the

12   ability.

13      The question we posed to them most recently was the

14   ability to access an Apple iPhone 12 Pro without and obtain

15   forensic data off of the phone without a password.  That was

16   what was posed to them most recently.

17      Q     Okay.  And just a little more back on the lab.  If

18   they take eight phones or other electronic devices from the FBI

19   and other agencies and routinely access those devices without a

20   passcode even if the passcode's unknown?

21      A     Yes.

22      Q     Okay.  Can you tell the Court what's your

23   understanding of how that's been, not in a hyper technical way,

24   but like commercial -- use of commercial software?

25      A     They can use commercial software, commercially

1    available software to access the phones.  Or they also have,

2    you know, other software that they can utilize to essentially

3    brute force the phone to obtain a passcode.

4        So there is commercially available software, forensic

5    software, that upon receipt of an update for a certain phone,

6    they can get into it.

7        And if not, there's alternative methods, which can be

8    utilized to open all sorts of phones to include Samsung Android

9    phones, Apple iPhones, computers, pretty much anything that

10   contains a password.

11       Q    All right, so I'm going to focus our attention on the

12   Apple iPhone 12 Pro.

13       A    Uh-huh.

14       Q    That the Government seized from the Defendant's home,

15   okay, even if the Government didn't have the passcode to access

16   the contents of that phone, would the FBI have been able to

17   access that phone regardless of whether the password was known

18   or not?

19       A    Yes.

20       Q    Okay.  When was that capability -- is this a

21   hypothetical possibility or something that FBI knows for

22   certain?

23       A    This is a certainty.

24       Q    Okay.  When did the FBI obtain the ability to access

25   an Apple iPhone 12 Pro running iOS 15.1?

1      A      There's two different ways.  My understanding is that

2  it can be accessed.  The first way that it can be accessed was

3  available through commercial software in January of 2024.  And

4  the second way that was -- it is able to be accessed was

5  available late summer of 2024.

6      So as I sit here today or if I sat here in September of

7  2024, the FBI through multiple methods could have accessed that

8  Apple iPhone 12 Pro, accessed 100 percent of the data contained

9  on the phone without -- with or without the password.

10     Q      Okay, and you just -- without getting into the real

11  minutia just generally how -- what does it mean to brute force

12  the phone?

13     A      And essentially, my understanding is it's a computer

14  program that bypasses the or, you know, engages with the

15  operating system to essentially run an algorithm that runs a

16  password combination, every possible password combination

17  against the phone until it finds the right one.

18     When it finds the right one, it provides the passcode and

19  it unlocks the phone.  So if you brute force a phone, which

20  could take -- this process could take a while depending on how

21  long the password is, but iPhone passwords typically are six

22  digits.

23     Once it gives you the password, it opens the phone for

24  you, but once you have the password, you can open the phone

25  yourself.  So it's just like as if a user unlocked the phone.

1    There's no restrictions.

2        Q    Okay.  Okay, and whenever the FBI takes this action

3    to unlock a phone through commercial software, what

4    applications or what content on the phone is typically

5    available to the FBI and the Government?

6        A    As -- if the phone has the capability that exists

7    today, the phone could be brute forced so you'd get 100 percent

8    of the data off the phone.

9        Q    Does that include WhatsApp messages, text messages,

10   communications, things of that nature?

11       A    It does.

12       Q    Okay.  Do you have anything to add about that process

13   in terms of how the FBI -- this is not a theoretical

14   possibility.  Has -- based on your discussions with members of

15   the FBI Forensic Lab, it's not just like this could be done,

16   but do you know that it actually has been done?

17       A    It has been done.  A phone of the same make and model

18   discussions have been had, that those phones have been unlocked

19   without the password through multiple methods recently.

20       Q    What is the FBI Lab's protocol if it receives a

21   device, a cell phone or some other device, that at least at the

22   present day is unable to be unlocked, but there's still legal

23   authority, whether it be by warrant or consent to search?  What

24   is the FBI do with that?

25       A    If the -- if a phone is turned into the lab, my

1    understanding is the phone was turned into the lab and it is

2    unsupported if it's a locked iPhone, the contents which could

3    not be obtained through commercially available software or

4    through the brute force method, the RCFL or the Regional Lab

5    has protocols to plug in the phone to a -- they have a bank of

6    phone chargers that's behind multiple locked doors where they

7    can maintain the phone.

8        And then, once a commercially available software becomes

9    available and there's updates to software that they already

10   have, that allows for that phone to be either opened or brute

11   forced, then at that point, the phone, they would go back to

12   the agent, explain the phone you've turned in six months ago

13   now can be accessed.  Would you like us to access it?

14       So they have a protocol to maintain the phone even though

15   it's not supported in anticipation that it can be supported in

16   the future.

17       Q    Okay, so in other words, is it your testimony that

18   efforts are continuing to be made by the Government to access

19   the phone from the time it's seized until it's either accessed

20   or returned to the Defendant for some other reason?

21       A    Correct, I think they reach out to the agent.  If it

22   does become available, to see if it's needed to make sure that

23   the legal authority's still available.

24       And if it's, you know, if it's of evidentiary value at

25   that point, sometimes may not be, but yes, bottom line is they

 1    have protocols to anticipate that not all phones -- if a new

 2    iPhone comes out tomorrow, the software doesn't catch up that

 3    quick.  They have to, you know, speculating that they would

 4    have to revise it for the new operating system.

 5        And so, it may not be available for some time.  So they

 6    anticipate those -- that situation and they don't turn people

 7    away.  They'll just maintain it until it does become available

 8    to be accessed.

 9        Q    Okay.  I just touch on this briefly.  I don't

10    think -- I don't know how necessary it is, but just to kind of

11    make sure the record's clear.  Whenever the FBI approached the

12    door of Mr. Bello's home, can you tell us about how the

13    interaction went?

14        A    We approached the door with the search warrant and an

15    arrest warrant for Mr. Bello, knocked unannounced.  The door

16    was opened and shortly after that, Mr. Bello was taken into

17    custody without incident.

18        Q    Okay.  Did the FBI breach the door, use any kind of

19    battering ram or device to breech the door?

20        A    As Mr. Bello said, the door was unlocked.  We had no

21    reason to make a forced entry.  And law enforcement, you make a

22    forced entry you make a situation that's not volatile,

23    volatile.

24        That would be if somebody's compliant, our goal is to keep

25    them as compliant as possible.  So to suggest that we made

1   forced entry of any kind when somebody came to the door is

2   ludicrous.

3             MR. TAYLOR:  I'll pass the witness at this time, Your

4   Honor.

5             THE COURT:  Any cross-examination?

6             THE DEFENDANT:  Yes, Your Honor.

7             THE COURT:  You can stand up at the lectern for that.

8                      **CROSS-EXAMINATION**

9   BY THE DEFENDANT:

10       Q    In your years of experience, in a -- this kind of

11   operation?

12       A    Uh-huh.

13       Q    Do you always have the body camera with you or you're

14   not authorized to do that?

15       A    At that time, the body camera program for the FBI had

16   began to roll out to certain field offices, but it was not

17   approved for the Dallas Field Office at that time.

18       Q    And don't you feel that was necessary for the

19   operation?

20       A    I'm sorry?

21       Q    Don't you feel that was necessary for the operation?

22       A    We were not issued body cameras at that time.  So I

23   don't have a body camera to wear.

24       Q    Now you said your door was unlocked.

25       A    Uh-huh.

1       Q    Okay.  Unlock the door is different from opening the

2    door.

3       A    Uh-huh.

4       Q    When the door was unlocked, did you twist the door to

5    open it or how do you get in?  How did you open the door?

6       A    No, the door was opened.

7       Q    No, it was not open.  So that's why we need the body

8    camera for.

9       A    Okay, well, we can agree to disagree.

10       Q    Yeah, now when you (indiscernible) and you -- I

11    invoked my right to the counsel, did you talk to me after that

12    or you did not?

13       A    Did I talk to you after that?

14       Q    You ask --

15       A    Of course, I did, yeah.

16       Q    Did you -- okay.

17       A    Sure.

18       Q    After I invoke my right?

19       A    Well, I'll disagree that you invoked your right.

20    I'll say that I voluntarily stopped asking questions.  You

21    didn't invoke your right.

22       Q    Did --

23       A    But we can disagree on that as well.  Yes, we

24    continued to have a discussion, but we did not have a

25    discussion about the merits of the case.

1      Q    Did you record the interview?

2      A    Of course.

3      Q    Was a recording?  Okay.  If you play the recording

4   message today, are you going to say in that recording I did not

5   invoke my right to the counsel?

6      A    Yes.

7      Q    Okay, now what was the condition you gave me that you

8   would stop?

9      A    It's on my recording.  We said you can stop at any

10  time.

11     Q    That's what -- any time that's what -- that is stop?

12     A    Yeah, we made that very clear.

13     Q    Okay.  Now after I invoke my right to the counsel,

14  which can we verify on your recording --

15     A    Uh-huh.

16     Q    -- you have same question, yes or no?

17     A    I asked you many questions.

18     Q    Good.  Did you ask me for the password to the phone?

19     A    I did not ask you for a password for the phone.

20     Q    Did your agent partner ask you for the password

21  phone?

22     A    Mr. Bello, you'd have to ask them that.

23     Q    Okay.  Was the password written in your person on a

24  piece of paper?

25     A    Not any piece of paper that I have -- that I had of

1    the search warrant.

2         Q    What's the name of the other agent that was with you

3    that day, that was in the office (indiscernible) with me?

4         A    There was a lot of agents in the office.

5         Q    There were two.  (Indiscernible.)  Now if you way go

6    to Fannin County?

7         A    I'm sorry?

8         Q    When you come to the jail to the Fannin County in

9    prison of (indiscernible) you remember that in the presence of

10   the -- of my counsel.  And I asked you the question about the

11   password.

12        A    Uh-huh.

13        Q    And I asked you if you was the one asking for the

14   password.  Do you remember that?

15        A    No, I don't.

16        Q    Okay.  Another question I have for you.  How

17   familiar -- how technical are you?

18        A    I have a Bachelor's degree in Information Technology

19   and I have a Masters degree in cybersecurity risk management.

20        Q    So when you are going to premises that you get a

21   (indiscernible) from AT&T, are you familiar with this?

22        A    I don't know what that is.

23        Q    It's a --

24             THE DEFENDANT:  This is a (indiscernible)?  Okay.

25   I'm going to add to this right now.  It's this one.  This is

1    from AT&T.

2    BY THE DEFENDANT:

3              Q    Okay, now, is it your information, I deal with

4    information technology.  So when they tell you what was the

5    block of IP address mean?

6        A    I don't know what you're referring to, Mr. Bello.

7        Q    When you say an IP address, you know what the meaning

8    of IP address?

9        A    Yeah, it's an Internet protocol address that's

10   assigned to typically a location.

11       Q    When they say a block of IP address, what does it

12   mean?

13       A    It means a range of IP addresses.

14       Q    Okay, now you have Internet at home, yes or no?

15       A    I don't understand the question.

16       Q    Do you have Internet at home?

17       A    Of course.

18       Q    Okay, do you have a block of IP address?

19       A    I do not.

20       Q    Good.  Now when you go to premises with this

21   information, does this not tell you this have to do with the

22   data center?

23       A    I would have to see the document that you're

24   referring to.  I don't know what you're -- I don't know what

25   the reference is.

1          Q     With the full description (indiscernible) full

2     description of --

3          (The Defendant confers with counsel)

4               THE WITNESS:    Okay.

5     BY THE DEFENDANT:

6          Q     Does that look familiar to you now?

7          A     It's a report, yes.

8          Q     Okay.  So what does that tell you about the IP

9     address and with the description there, what does that tell

10    you?

11         A     It says in a letter from AT&T, it says IP address

12    1211.136.106 is a block of IP addresses subleased and assigned

13    to a direct Internet access or managed Internet service or

14    serial IP.

15         Individual IP assignments are controlled and managed by

16    the entity below.  Ajide Technology, 2105 Dublin Court, Collin

17    County, Texas.  Primary contact, Olamide Bello.  The LAN IP

18    blocks are 12.11.136.104 through 29 and 12.20.37.0.326.  And

19    then it had IP 86 IP address as well.

20         Q     Now with your level of experience, you said you have

21    experience in information technology, what I get -- what can

22    you tell about the information you just read right now?

23         A     The 1211.136.104 is tied to 2105 Dublin Court.  And

24    it's tied to Olamide Bello.

25         Q     Can I have that piece back?  Uh-huh.  With someone

 1   with your experience in information technology, (indiscernible)

 2   and having no (indiscernible) IP address because it's spelled

 3   out with the description here just for your information.

 4        Now so you know you are going to data center?  Yeah.

 5        A    I --

 6        Q    Did you see the servers in the house house when you

 7   came or did you did not see it?

 8        A    Of course we did.

 9        Q    Okay, what does that tell you also?

10        A    I've been in houses that have servers that have

11   nothing to do with the business, Mr. Bello.

12        Q    But you just read now (indiscernible) 2105, right?

13   You just read it now.  So it has not to do in business.  Does

14   that ring bell to you now?

15        A    No.

16        Q    Okay.  When you read this thing now and you go

17   (indiscernible) even in that name, is Ajide Technology.

18        A    No.

19        Q    The Government does not cite Ajide Technology in the

20   indictment?

21        A    12.11.136, whatever the IP address, is tied to you

22   and your home.

23        Q    Point primary contact, right, owned by who?  Entity.

24   Does it make sense now?  Entity, what is the (indiscernible)?

25   Do you know by definition what does entity mean to you?

1       A    It's tied to you at your residence.  That's --

2       Q    What is -- let me ask you a question.  What does

3   entity means to you?

4       A    It means an organization.

5       Q    Okay, good.

6       A    Uh-huh.

7       Q    Is Olamide Bello an organization?

8       A    Is what?

9       Q    Is Olamide Bello an organization?

10      A    No, it's a person.

11      Q    Great, what's the difference between a person and a

12  corporation with your experience?

13      A    What's the difference between what?

14      Q    Between a person, Olamide, and a corporation?

15      A    A person is an individual.

16      Q    Good.  Are you a corporation?

17      A    No, but I can control a corporation.

18      Q    Yeah.  That's -- (indiscernible) indictment guilty,

19  right?  You offer a company, the Government as well, right?  So

20  you work for the Government, right?  Correct.  Now are you if

21  you control (indiscernible) when it came out there, does it

22  mean you are the Government?

23      A    Yes.

24      Q    So you're the Government because you are the United

25  States because you control your team?

1          A     I represent the United States of America.

2          Q     Please.  Representation of everything the citation

3    and the actuality.

4          A     I don't understand the question.

5          Q     When you represent something, are you the one?

6          A     Yes.

7          Q     Or no when you represent something, you represent the

8    United States of America?

9          A     I represent the FBI sitting in this chair right now.

10         Q     Okay, so you not --

11         A     -- me as an individual, you have to let me finish if

12   you ask me a question.  Me as an individual, I represent the

13   FBI sitting here under oath.  So I disagree with you.

14         Q     Okay, now you represent FBI, right?

15         A     Uh-huh.

16         Q     Good.  I was speaking to you now, but I'm addressing

17   FBI, because you represent FBI, correct?

18         A     Right.

19         Q     Good.  Now there's an entity Ajide Technology

20   (indiscernible) is the same thing like you representing FBI,

21   correct?  You are the point of contact as you speak right now

22   for FBI, correct?

23         A     That's incorrect.

24         Q     So you just mentioned that you represent the FBI?

25         A     That's right.

1        Q    Okay, so am I now talking to FBI now?

2        A    You're talking to an FBI agent.

3        Q    Okay, right.  So you are representing FBI.  You are

4   the point of contact right now to get FBI to address -- to ask

5   FBI question, correct?  Yes or no?

6        A    Is that a question?

7        Q    Yes, a question.

8        A    If you want to -- I represent the FBI in this matter

9   at this moment.

10       Q    Right.

11       A    If you have a question about the FBI somewhere else,

12  I'm not the point of contact.

13       Q    No, you are sitting on there right now as a

14  representative of FBI.  If I need to talk to FBI, should speak

15  right now I addressing FBI in your official duty, correct?

16       A    Related to this matter, which we're here for.

17       Q    Yes, correct?

18       A    Correct.

19       Q    So now when you have this thing right here, see not

20  the way you just mention right now, I am the point of contact

21  for who?  Ajide Technology.  I was representing Ajide

22  Technology, correct?  Yes or no?

23       A    According to AT&T.

24       Q    Great, that answered my question.  So you agree with

25  me Olamide was a representative of Ajide Technology?

```
 1          A    According to AT&T.

 2          Q    Great.

 3          A    Are you familiar with this screenshot?

 4          Q    I don't know what this is.

 5          A    Now let me ask you one more question though.  So

 6     where was Sabur on the day of the revocation hearing?

 7          A    Who is that?

 8          Q    Sabur Olawale Yusuff, your witness.

 9          A    You're going to have to speak a little slower.

10          Q    Sabur Olawale Yusuff was your witness.

11          A    Mr. Yusuff?

12          Q    Yes.  Where was he on the day of the revocation

13     hearing?

14          A    I don't know.

15          Q    Why did you speak on it?  Why I wasn't given the

16     opportunity for confrontational cross to make him available

17     that day?  Was there a reason?

18          A    That's a question that you'd have to ask the Court or

19     the U.S. Attorney's Office.  That's not a question I can

20     answer.

21          Q    And Sabur say, okay, you can go ahead and represent

22     me.  I won't make it all just something make up?

23          A    I don't understand the question.

24          Q    The question is why were you sitting on that table

25     speaking on behalf of Sabur Olawale Yusuff, which was mentioned
```

 1    as a witness?  What was your role?  Why were you representing

 2    anybody?

 3        A    I've answered your question.  I don't know where he

 4    was.

 5            MR. TAYLOR:  I understand that there really isn't an

 6    opportunity for any objections, but I feel like this is just

 7    getting into legal matters that just really aren't relevant to

 8    this witness' knowledge.

 9            THE COURT:  Mr. Bello, if you could focus your

10    questioning on matters that go to your motion to suppress.

11            THE DEFENDANT:  Okay, now I want to share this

12    screenshot with you.  Yes, it's -- and I want to show these

13    pages, 542.  This one as well.  I don't have a copy, but is

14    there any way you can have a copy of this, because I made a

15    copy also as well.  Maybe you can turn to your copy, so.  He

16    doesn't have this?  Yes, this one here, yes.

17        (The Defendant confers with the Clerk)

18    BY THE DEFENDANT:

19        Q    Now looking at this, the three -- the document you

20    have with you, does that look familiar to you?

21        A    No.

22        Q    Okay, that was the other day you presented at the

23    revocation hearing.  And that's one of the evidence that was

24    tampered.

25        A    Well, if this is evidence that was presented at the

 1    hearing, I'd like the file marked copy, please?

 2        Q    Okay, well, do you have -- (indiscernible) right now.

 3    So --

 4        A    I can't validate or verify where these came from.

 5        Q    Okay, is there any way you can look --

 6        A    The messages that we presented to the Court --

 7        Q    Uh-huh.

 8        A    -- are on in the docket, right?  And those are filed

 9    marked.  And those are the ones I want to see.

10        Q    Yes.

11        A    I don't know where these came from.

12        Q    Yeah, that's why if you can look it up or can I have

13    the page or page number 5, the one that says ASURE?

14        A    Thanks.

15            THE DEFENDANT:  Now if you look at the -- is there

16    any way you can share with him Docket 139, page 4 of there?

17    Now do you have it open?  Oh, okay.  Do you have it open now?

18    I don't have access to (indiscernible) so on the computer.  So

19    I wonder if you can help assess (indiscernible) you don't want

20    to use the one that was (indiscernible) give to me.

21            THE WITNESS:  I want to see the one that was used in

22    the revocation hearing.  That's the one I want to see.

23            THE DEFENDANT:  It's what's printed out and give to

24    you, but it become -- I don't have access to the docket online.

25            THE WITNESS:  I don't either, Mr. Bello.  I don't

1    know what to do.

2              THE DEFENDANT:  Your Honor, may you allow him to view

3    Docket 139, page 5, please?

4              THE COURT:  If you have the exhibit to put on the

5    screen, we can do that.

6              THE DEFENDANT:  Can you put it onto the screen?

7              THE CLERK:  We don't have --

8              THE DEFENDANT:  I don't have anything, Your Honor.

9              THE COURT:  Well, I'll ask counsel then if there's a

10   way that this can happen?

11             THE DEFENDANT:  Now (indiscernible) present as

12   evidence that day and in the discovery, the same evidence was

13   presented as well were more comprehensive.  And there were

14   discrepancy in the information it presented.  That's why I just

15   want him to clarify, Your Honor.  But I don't have any way of

16   showing it, but it's right here.

17             It was printed out and was given to me.  And I have

18   this one for this copy as well.  So there were modification in

19   one of discovery, which is more detailed in the discovery.

20             And in the one you presented on the revocation

21   hearing was incomplete messages.  So I had previous to access

22   the complete messages.  That's where I was able to figure out

23   where the error come from.

24             THE WITNESS:  Where did you access the complete

25   messages?

1          THE DEFENDANT:  In the discovery they sent it to me

2   (indiscernible).

3          THE WITNESS:  Okay, so you're alleging that we --

4          THE COURT:  Sir, generally, you're going to be

5   answering questions and not asking them from that seat.  Is

6   there something for the Government on this?

7          MR. TAYLOR:  I just want to make -- I think there's

8   been an admission by the Defendant this evidence was not seized

9   from him.  So for the sake of time, I don't know if there's

10  standing to get into this line of questioning.

11         THE COURT:  Okay, so it's a good point.  Here we are

12  at 4:14.  We need to wrap things up.  So I would say if you

13  have cross-examination that goes to something relevant --

14         THE DEFENDANT:  Yeah.

15         THE COURT:  -- you need to wrap that up.  And then,

16  I'm going to take legal argument from the Government on your

17  motions.

18         THE DEFENDANT:  Your Honor, I really document was

19  (indiscernible) for me, but the document was used against me.

20  That was reason why.

21         THE COURT:  Right, we're on a motion to suppress

22  evidence, though.

23  BY THE DEFENDANT:

24     Q    Now on the 357, you mentioned you got a search

25  warrant, right, for the house?  Did you get a search warrant

1    for the phone?

2        A    It's included in the one for the house.

3        Q    Okay, so you think, you feel you do not need a search

4    warrant for the phone separate from the house?

5        A    The Court by granting the search warrant gave me the

6    authority to search the phone.

7        Q    Okay, do you believe that phone is different?  You

8    have to get a search warrant for it.  There's a case law for

9    that as well, which I already -- I can -- I have it in the

10   motion as well.  Now did I consent to the scope of the search

11   warrant on the cell phone?

12       A    The search warrant granted by this Court gave me the

13   authority to seize and search the phones in your possession.

14       Q    Please, I just need to know did I consent to the

15   search the phone on the cell phone, yes or no, please?

16       A    The search warrant granted by this Court gave me the

17   authority to seize and search the contents of the phone in your

18   possession.

19       Q    Now did you -- you did not consent to search the cell

20   phone and the search warrant allow the Government to download

21   the data for the cell phone onto a device, keep this data

22   infinity and go to it at any time?

23       A    It allows the Government to access the phone and

24   download the data.

25            THE DEFENDANT:  Your Honor, I have a case law for

```
 1    this in the motion.
 2            THE COURT:  Okay, if it's cited in your motion, we'll
 3    consider it.  This is your time to wrap up your cross-
 4    examination.
 5            THE DEFENDANT:  I rest my case, Your Honor.
 6            THE COURT:  Thank you.
 7            Is there any redirect?
 8            MR. TAYLOR:  Just maybe three questions and be done.
 9    Can I just do it from here, Your Honor?
10            THE COURT:  Sure.
11                      REDIRECT EXAMINATION
12    BY MR. TAYLOR:
13       Q    Agent Redding, just so we're clear, were the WhatsApp
14    messages that were presented at the revocation hearing, were
15    those provided by Sabur Yusuff?
16       A    Yes.
17       Q    Was it provided by him voluntarily to you?
18       A    Yes.
19       Q    You didn't get them from Mr. Bello?
20       A    No.
21       Q    Okay, you testified regarding the FBI's capability to
22    access the contents of his cell phone with or without the
23    passcode; is that right?
24       A    Yes.
25       Q    You see in the courtroom today, Mr. Dozier
```

1  (phonetic)?

2       A    I do.

3       Q    How do you know Mr. Dozier?

4       A    Mr. Dozier's a special agent with the FBI.

5       Q    And what is his -- what's his job?  What does he do?

6       A    He's a -- in addition to a supervisor special agent,

7  he's also the director, the lab director for the North Texas

8  Regional Computer Forensics Lab.

9       Q    And is some of your testimony regarding the FBI's

10  capability to access the phone without a password based on

11  conversations you've had with the director of the lab?

12       A    Correct.

13            MR. TAYLOR:  And just for the sake of time, Your

14  Honor, I just want to kind of (indiscernible) agent's

15  testimony.

16  BY MR. TAYLOR:

17       Q    And is your understanding that the FBI has done this

18  routinely in terms of accessing iPhones, iPhone 12s the last

19  seven months?

20       A    Yes.

21            MR. TAYLOR:  Pass the witness, Your Honor.

22            THE COURT:  Any --

23            THE DEFENDANT:  Sorry, Your Honor?

24            THE COURT:  I'm sorry, did you have something else?

25            THE DEFENDANT:  Yeah, because I didn't show in the

```
 1    discovery all the evidence they downloaded from my cell phone

 2    from the -- I mean, from the 816 number and the two numbers

 3    here that (indiscernible) all the -- where they plug into the

 4    Cellebrite is right here, but it's also in the discovery as

 5    well.

 6              THE COURT:  Okay, you may sit down, thank you.

 7              THE WITNESS:  I apologize Your Honor for asking a

 8    question.

 9              THE COURT:  It's quite all right.

10              THE WITNESS:  Thank you.

11         (Witness is excused)

12              THE COURT:  Does the Government have any other

13    witnesses?

14              MR. TAYLOR:  No, Your Honor.

15              THE COURT:  Okay, I'm going to take a brief recess

16    before I hear argument on these motions.  Let's be back here

17    around 4:30.

18              THE CLERK:  All rise.

19         (Recess taken at 4:19 p.m., recommencing at 4:37 p.m.)

20              THE BAILIFF:  All rise.

21              THE COURT:  Please be seated.  Okay, we're back on

22    the record in number 4:23-CR-136, United States v. Bello, a

23    hearing on the three motions to suppress.

24              At this point, I would like to hear argument from the

25    Government on the motions.
```

1          And then, I'll let Mr. Bello, I'll let you respond to

2     that argument.

3          And then, we'll conclude the hearing.  I'd like to

4     finish up by around 5 if we can.

5          MR. TAYLOR:  Yes, Your Honor.  Your Honor, I'm going

6     to endeavor to just path -- pave a path that's just going to be

7     I think what the most -- the easiest way for the Court to

8     resolve the pending motions.

9          I'll just take them one at a time and give a

10     recommendation for the Court.  First, with regard to Docket

11     entry 353, this was the motion in which the Defendant attempted

12     to suppress the evidence presented at the revocation hearing.

13          And I'll -- I guess (indiscernible) if it were

14     presented at trial, these are -- these were WhatsApp

15     communications from Sabur Yusuff.  The Court can deny this

16     motion because there's no allegation by the Defendant that

17     the -- that he had a privacy right in that evidence.

18          It's undisputed that the evidence was received

19     voluntarily from a third party.  And so, there's really no

20     suppression or the exclusionary rule's inapplicable in that

21     case.

22          In any event, if the Defendant would like to make

23     arguments about the veracity or authenticity of that evidence,

24     he had the opportunity to do so at the hearing and he will have

25     the opportunity to do so at trial.  The suppression's not the

1    appropriate remedy.

2          Next with regard to Docket number 354, and then kind

3    of take this in three bites.  First, I just kind of want to

4    make this as easy as possible on the Court.  There were several

5    devices that were seized.

6          As mentioned at the end of the hearing, those that

7    weren't already returned have been returned through Mr. Linder.

8    The only item that anything of evidentiary value was found was

9    the iPhone.

10          And so, I'm not -- the Government doesn't necessarily

11    concede that suppression is warranted, but just stipulate that

12    there's -- that those -- that any information received from the

13    other devices will not be used at trial.  So I'm just trying to

14    narrow the issues here.

15          So with regards to the iPhone, the Court heard

16    conflicting evidence about whether he unequivocally

17    invoked -- whether the Defendant unequivocally invoked his

18    right to counsel, whether he was asked or he just provided the

19    numbers.

20          I want to kind of just focus on two things.  Number

21    one, there's an admission by the Defendant that that wasn't his

22    phone.

23          And number two, the inevitable discovery, the Court

24    received evidence from the agent that was based on both his own

25    experience and conversations with the expert from the FBI lab

1    that the FBI has the ability to access the contents of this

2    specific cell phone as an Apple 12 Pro running that specific

3    software.

4        The FBI today and has for quite some time had the

5    ability to access the contents of that phone even with

6    the -- even without the password.  In fact --

7        THE COURT:  Yes.  So let me just ask you about that.

8    I think -- so you have the burden on that.

9        MR. TAYLOR:  Right.

10        THE COURT:  It's the preponderance standard.

11        MR. TAYLOR:  Correct.

12        THE COURT:  There are two showings I think you have

13    to make.  Tell me if I'm wrong in any of this.  First is a

14    reasonable probability if the evidence would have been

15    discovered by lawful means in the absence of the alleged

16    misconduct, which is I think what you're talking about with the

17    FBI and its ability to access the phones as your witness

18    testified to.

19        And then, the second is that the Government was

20    actively pursuing a substantial alternative line of

21    investigation at the time of the violation.

22        And so, that second prong, I'm just wanting to make

23    sure I understand your argument on that.  I think it's that you

24    solicited or you elicited testimony about how phones go into

25    the FBI with the understanding that when the technology catches

1    up, they can be accessed at that point.  Is that right?

2           MR. TAYLOR:  That's correct.  Your Honor, the agent

3    testified that if the technology isn't there that day, it's not

4    like they just give up.  At that point, they're -- they are put

5    into controlled room with power with the intention and the

6    pursuit of eventually breaking into that phone so to speak.

7           THE COURT:  Okay.  And let me ask you one other thing

8    about something you just said.  I think what you're saying

9    about the phones not being Bello's phones, is that he doesn't

10   have standing to make a Fourth Amendment claim; is that right?

11          MR. TAYLOR:  So that was the kind of the first time

12   I've heard that today.  I might need to do some more research

13   on that, but so at first blush, there's admission by the

14   Defendant that he wasn't the owner of the phone.  It was this

15   company Ajide.

16          And so, again, I probably need to think about this a

17   little more and try to do some research, but of course, in

18   order to bring -- in order to move to suppress evidence, the

19   movant has to have privacy interest or like possessory

20   interests of that item.  And if it's owned by the corporation

21   that may be a break in the -- in that interest.

22          THE COURT:  Okay.  So, on that point, I need to move

23   quickly on a decision -- in this -- on these motions, but I

24   want to have the benefit of any further briefing that either

25   side has.

1          And I think trying to balance those two interests,

2     I'd like to receive anything further from either side by 5:00

3     p.m. on Tuesday of next week.

4          MR. TAYLOR:  Yes, Your Honor.

5          THE COURT:  And I'd appreciate it, you know, you

6     sending me case law, either of you that you think applies to

7     any of the points that were raised today.  So just to get that

8     out there, I'll let you keep going.

9          MR. TAYLOR:  Okay.

10         THE COURT:  But I think that'll be the best way to

11    approach that.

12         MR. TAYLOR:  Yes, Your Honor, of course.  Okay,

13    second chunk on the second motion regarding the forced entry, I

14    think the Court received testimony from Agent Raney.  That just

15    didn't happen.

16         So I think it's -- number one, it's a credibility

17    determination by the Court.  There's evidence from the

18    Government that the agents did not make forced entry, but also,

19    as presented in the Government's response, even assuming there

20    was forced entry under history of case law in Supreme Court

21    case law, that's not -- suppression is not the remedy either

22    for a common law or statutory violation they're not an

23    announced rule.

24         Next, I just want to make sure I kind of fairly

25    articulate the Defendant's argument.  He made some arguments

1    about, well, the Government didn't take everything, and then,

2    we didn't get so much in the hearing, but he also made an

3    argument in the brief that there was some omissions in the

4    warrant.

5            Of course, the Government is not required to take all

6    evidence.  I think the -- that's pretty clearly to be resolved.

7            THE COURT:  Yeah, let me stop you there and ask if

8    your understanding is that there was a search warrant issued

9    for all the evidence that we're talking about today.

10           MR. TAYLOR:  That's right, yes, yes, Your Honor,

11   there's a search warrant that this Court signed to search the

12   Defendant's home.  Several items were taken, including the

13   iPhone that was -- as electronic devices, that was the only

14   thing of evidentiary value we're discussing.

15           THE COURT:  Okay, and then, we talked about you just

16   mentioned what the proper remedy is.  Let me ask you.  I think

17   this is a related question whether so a suppression motion's

18   the proper way to challenge evidence admitted at the detention

19   hearing.

20           I think your answer is noted and I wonder if you

21   could say a little bit about that and point me to the right

22   case law --

23           MR. TAYLOR:  Yeah.

24           THE COURT:  -- that supports your decision.

25           MR. TAYLOR:  So I can -- if you don't mind, I can

 1    find some case law by Tuesday at 5.

 2            THE COURT:  Sure.

 3            MR. TAYLOR:  In terms of moving to suppress evidence

 4    as presented at a hearing that already happened, my -- I mean,

 5    again, I'll do some more research.  I think that moot -- that

 6    is moot at this point.

 7            The hearing already happened.  As the Court's aware,

 8    even the weekly -- my thinking even a legally obtained evidence

 9    can be presented at a pre-trial hearing.  I'll double check

10    that, and if I'm wrong, I'll inform the Court about that in my

11    follow-up brief.

12            But the suppression -- the exclusionary rule is a

13    trial remedy, not necessarily a pre-trial hearing.  So I don't

14    think that that would even -- assuming that the evidence was

15    obtained illegal, which we dispute, I don't think that even a

16    remedy available for a revocation hearing, especially when

17    that's already concluded.

18            THE COURT:  Okay, thanks.

19            MR. TAYLOR:  Okay, and then finally, in the last

20    motion, the Defendant filed 353, my understanding is that the

21    Defendant is claiming that the search of his cell phone

22    exceeded the scope of his consent, but of course, we

23    didn't -- the Government didn't rely on his consent to search

24    the phone.  It relied on a warrant this Court issued.

25            And I guess I'll just conclude that I've done my best

1    to sort of respond to I think the Defendant is arguing.  If

2    there are issues that the Court perceives that I haven't

3    addressed, I just have the opportunity to respond because I --

4            THE COURT:  Uh-huh.

5            MR. TAYLOR:  -- it's a little bit -- it's a little

6    bit heard to follow sometimes.

7            THE COURT:  Yeah, so let me see.  Let me just look

8    and see if I want to ask you anything else about what's been

9    argued today.

10           My understanding is that there's some uncertainty in

11   the case law about whether giving a password is testimonial.

12   Do you have a view on that or is your position that regardless

13   of how the Court might think about that, it's just not

14   relevant?

15           MR. TAYLOR:  You're absolutely right.  I did a lot of

16   research on that issue.  I don't see where the Supreme Court

17   has really addressed it.  The magistrate and district courts

18   are probably leaning towards testimony, but the reasoning is

19   pretty varied.  And I don't think we've got a bright line rule.

20           Frankly, there's -- the Court heard some evidence

21   that is conflicting about did the Defendant unequivocally

22   invoke his right to counsel.  Was he asked or was it just that

23   he was going to provide it?

24           My take on it is the Court can just bypass all that

25   and just go to the inevitable discovery exception where the

1    evidence shows that the FBI would have gotten to the phone with

2    a certainty to access all the evidence that it accessed even

3    with had the Defendant not provided the passcode.

4              THE COURT:  Right, okay, so you're -- you would

5    answer the hypothetical, well, let's assume that there was a

6    request -- an improper request for password and let's assume

7    that when it goes up to the Supreme Court -- when the Supreme

8    Court addresses the question, it'll find that that's

9    testimonial even taking all that as the case, because of the

10   inevitable discovery doctrine, you would still prevail here; is

11   that right?

12             MR. TAYLOR:  That's right.

13             THE COURT:  Okay.

14             MR. TAYLOR:  If we just assume that it's testimonial

15   and there is -- it was illegal, we solicited -- elicited, the

16   general discovery doctrine still negates the suppression or the

17   exculpatory -- or excuse me, the exclusionary rule.

18             THE COURT:  Okay, let me see about what else here.

19   So was there an argument that you're making that there was

20   consent to provide the passwords?

21             MR. TAYLOR:  I don't know that -- can I just ask the

22   agent?

23             THE COURT:  Yeah, sure.

24        (Counsel confers with the agent)

25             MR. TAYLOR:  Okay, so the question I think in

1    the -- no, I don't think I actually offered the recording, but

2    it's in the binder and I don't know if you need to enter that

3    now with it.

4            THE COURT:  It's on the disk at the end of this

5    binder.

6            MR. TAYLOR:  Right, right.  The question -- I think

7    the statement is we're going to need the passwords.  And he

8    said that's not a problem.

9            And so, is that a question?  Is that just sort of

10   ministerial?  I just -- I couldn't -- it's not clear, I'll just

11   say that.

12           And so, I think that in the course of law enforcement

13   just kind of time loosens and before someone's taken to jail,

14   there are certain questions that law enforcement goes through.

15           But again, I think that the issue on inevitable

16   discovery is the clear path towards --

17           THE COURT:  Okay.

18           MR. TAYLOR:  It's not in the motion.

19           THE COURT:  Sure.  I just want to make sure I'm

20   covering all the bases.

21           MR. TAYLOR:  Right.

22           THE COURT:  Depending on how this could go.  Okay, so

23   that all -- if you could make that part of your written

24   submission that he's going to need the passwords pinpoint from

25   Exhibit 4 I guess.

1          And then, in the same vein of just completeness, if

2    you could provide the best case for applying the good faith

3    exception to the exclusionary rule on these facts, again, not

4    suggesting the Court's going to reach anything, I just want to

5    get the best position of the Government on those things.

6          MR. TAYLOR:  Yes, Your Honor.  Okay, just to make

7    sure I'm clear on the assignment, highlight the part of the

8    interview that deals -- that at least or some interview deals

9    with password, the good faith exception, the ownership of the

10   phone.  And I feel like there's one other thing that you asked

11   about.

12         THE COURT:  Let's see here.  The -- you know, whether

13   the suppression motion is the way to challenge evidence

14   submitted at the detention hearing --

15         MR. TAYLOR:  Right.

16         THE COURT:  -- maybe that was the one that was not on

17   the --

18         MR. TAYLOR:  Correct, Your Honor.

19         THE COURT:  Okay, yeah.

20         MR. TAYLOR:  Okay, discussing -- discussion of the

21   passcode, good faith exception, ownership of the phone, and

22   suppression in the revocation context.  Okay.

23         I'm happy to respond to any other questions or I know

24   it's almost 5, so --

25         THE COURT:  No, I appreciate it.  I'll hear from

1    legal argument from you, Mr. Bello, and then, we'll close out

2    these hearings or this hearing on the three motions, rather.

3         THE DEFENDANT:  Your Honor, when they came to the

4    house, the phone was in my possession at a point.  And even

5    though the phone belongs Ajide, was also my possession at the

6    point.

7         And at the same time, there were condition that were

8    (indiscernible) to stop asking me for that question, which was

9    the only condition by case law is vocation of the counsel.

10        If I didn't invoke the right to a counsel, they will

11   not stop.  They would continue with the interview.  So they

12   (indiscernible) to me was when any point when I invoke the

13   right to the counsel, they will stop, which I did and they did

14   stop, but they come back and ask me question.

15        I want to (indiscernible) as well.  At the same time,

16   (indiscernible) if you come back the day that -- before it was

17   in my possession at the point, it won't wait another the owner

18   of the firm without (indiscernible).  Everything come from that

19   phone cannot be used against me, because does not belong to me.

20        THE COURT:  Okay, so one question I have here is I

21   wonder if you could state succinctly what evidence that you're

22   seeing to suppress through across all three of these motions

23   that we're hearing today?

24        THE DEFENDANT:  All evidence derived from the cell

25   phones, they're a bunch of them from Cellebrite.

1             THE COURT:  And the cell phones, you mean the two

2    cell phones that you're talking about today?

3             THE DEFENDANT:  The two cell phones.

4             THE COURT:  Is there anything else that you're trying

5    to suppress?

6             THE DEFENDANT:  No, another thing I want to point out

7    is in the docket, in the execution of the search warrant, they

8    were given the autonomy to mandate to pick everything in the

9    house.

10            Now when they come back and they report to the Court

11   that this was as a (indiscernible) completed.  That means

12   because the discrepancy, they did search warrant order and it's

13   shh --

14            THE COURT:  Okay, but just to make sure again, I want

15   to know everything you're trying to seek, you're seeking to

16   suppress, every piece of evidence?  And I've heard you say all

17   evidence derived from the two mobile phones?

18            THE DEFENDANT:  Yes.

19            THE COURT:  What else if anything?

20            THE DEFENDANT:  That everything they picked from my

21   house because --

22            THE COURT:  Everything --

23            THE DEFENDANT:  -- forced entry.

24            THE COURT:  Everything --

25            THE DEFENDANT:  From the house.

1              THE COURT:  -- that any officer took from your house

2      that day?

3              THE DEFENDANT:  Correct, Your Honor.

4              THE COURT:  Okay.

5              THE DEFENDANT:  Your Honor, I'm not a law enforcement

6      officer, but I believe they should be able to be equipped with

7      a camera, so they can present what happened, because picture we

8      know they portray what happen on that day.

9              But if I'm not available, but the frame of the door

10     is here, because we haven't got money to replace the seal.  So

11     but the camera shows if there's a camera they can see how they

12     push the door, even though it was unlocked.

13             THE COURT:  Okay.

14             THE DEFENDANT:  It was unlocked, yeah.

15             THE COURT:  But again, we're here on your motions to

16     suppress.  We need to confine the discussion to that.  Let me

17     ask you one other question about the passwords.  And you said

18     you were compelled to provide your passwords?

19             THE DEFENDANT:  Correct.

20             THE COURT:  Were you compelled to provide passwords

21     for just these two phones or for anything else that we've

22     talked about?

23             THE DEFENDANT:  Computers as well.

24             THE COURT:  Okay, how many?  How many total passwords

25     were you asked to give?

1        THE DEFENDANT:  Two phones, one -- two laptops, and

2    the login to the network.

3        THE COURT:  Okay, thank you.  Is there anything else

4    that you want to say?

5        THE DEFENDANT:  Another thing I want to point out is

6    to be able to find out if begin search warrant, because they

7    provide the search warrant for the phone as well, because in

8    the search warrant was to (indiscernible), not for the phone.

9        And possess said phone I believe by the case law I

10   have in my motion, they're supposed to have a search warrant as

11   well for the cell phone as well.

12       THE COURT:  Okay, and we have your motions that cited

13   case law.  As I said to the Government's counsel, if you have

14   anything else that we should consider on these motions,

15   including additional case law, please have that to us by 5:00

16   p.m. on Tuesday of next week.

17       THE DEFENDANT:  Thank you, Your Honor.

18       THE COURT:  Is there anything further from the

19   Government?

20       MR. TAYLOR:  No, Your Honor.

21       THE COURT:  Anything further from the Defense?

22       MR. LINDER:  No, Your Honor.

23       THE COURT:  Thank you.  Court is adjourned and is in

24   recess.

25       THE CLERK:  All rise.

1          (Proceedings concluded at 4:58 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5     that the foregoing is a correct transcript from the official

6     electronic sound recording of the proceedings in the above-

7     entitled matter.

8

9

10

11          /s/ *Chris Hwang*

12          _____          January 9, 2025

13          Chris Hwang                    Date

14          Court Reporter

15

16

17

18

19

20

21

22

23

24

25